This Opinion is a
Precedent of the TTAB

Hearing: January 24, 2017                     Mailed: December 20, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Kohler Co.*
*v.*
*Honda Giken Kogyo K.K.*

————

Opposition No. 91200146

————

Kenneth R. Nowakowski and Melinda Giftos, of Husch Blackwell LLP for Kohler Co.

Vinita Ferrera of Wilmer Cutler Pickering Hale and Dorr LLP for Honda Giken Kogyo K.K.

————

**Notice of Correction**

**By the Board**:

On December 13, 2017, the Board mailed a final decision in this proceeding. It has come to the Board's attention that the photograph of the Mantis Control on the left-hand side of page 105 duplicated the photograph of the Poret Control on the right-hand side of the page, and did not show the actual Mantis Control, which also appears on the right-hand side of page 96. A corrected form of the December 13, 2017 opinion showing the Mantis Control photograph on page 105 is attached hereto.

This Opinion is a
Precedent of the TTAB

Hearing: January 24, 2017                    Mailed: December 13, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Kohler Co.*
*v.*
*Honda Giken Kogyo K.K.*

_____

Opposition No. 91200146

_____

Kenneth R. Nowakowski and Melinda Giftos, of Husch Blackwell LLP for Kohler Co.

Vinita Ferrera of Wilmer Cutler Pickering Hale and Dorr LLP for Honda Giken Kogyo K.K.

_____

Before Adlin, Heasley, and Larkin,
    Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

## Table of Contents

Introduction

I. Prosecution History, Pleadings, and Evidentiary Record

  A. Prosecution History

  B. Pleadings

  C. Evidentiary Record

    1. Opposer's Evidence

      a. Trial Testimony

      b. Notices of Reliance

      c. Witness Declarations

2. Applicant's Evidence

    a. Trial Testimony

    b. Notices of Reliance

II. Evidentiary Objections

  A. Applicant's Objections to Admissibility of Japanese Utility Model Applications

  B. Applicant's Objections to Admissibility of Foreign Trademark Documents

  C. Opposer's Objections to Admissibility of Court Documents From Prior Civil Infringement Litigation Between Applicant or American Honda, and Third Parties

  D. *Daubert* Motions

    1. Mieritz Testimony Regarding Comparative Engine Performance, Cost, and Quality

    2. Mieritz Testimony Regarding Industry Recognition of GX Engine

    3. Reisel Testimony

  E. Applicant's Renewed Motion to Exclude Whitmore Testimony

III. General Factual Background Regarding the GX Engine and Applicant's Claimed Mark

  A. General Purpose Utility Engines

  B. The Development of the GX Engine

  C. Redesign of the GX Engine

IV. Standing

V. Defining the Claimed Mark

VI. Opposer's Functionality Claim

  A. The Law of Functionality

  B. The Parties' Arguments Regarding Functionality

  C. The Components and Overall Design of the GX Engine

    1. The Fan Cover

    2. The Fuel Tank

    3. The Carburetor Cover

    4. The Air Cleaner Cover

5. The Claimed "Configuration of an Engine With an Overall Cubic Design"

6. The Applied-For Mark in Its Entirety

D. The *Morton-Norwich* Categories of Evidence

1. The Existence of a Utility Patent Disclosing the Utilitarian Advantages of the Design

    a. United States Utility Patents

    b. Japanese Model Applications

    c. United States Design Patents

2. Advertising Touting the Utilitarian Advantages of the Design

3. Competitive Alternatives

4. Simple and/or Inexpensive Methods of Manufacture

VII. Opposer's Claim of Lack of Acquired Distinctiveness

A. Opposer's Prima Facie Case

B. Applicant's Evidence of Acquired Distinctiveness

1. Direct Evidence

    a. Testimony

    b. Surveys

2. Circumstantial Evidence

    a. Length and Exclusivity of Use

    b. Sales and Advertising

    c. Proof of Intentional Copying

Decision

Appendix

**Introduction**

Honda Giken Kogyo K.K. ("Applicant" or "Honda") seeks registration on the Principal Register under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), of the product configuration mark shown below for "engines for use in construction, maintenance and power equipment," in International Class 7:[1]



The mark is described in the application as follows:

> The mark consists of the configuration of an engine with an overall cubic design, with a slanted fan cover, the fuel tank located above the fan cover on the right, and the air cleaner located to the left of the fuel tank. The air cleaner cover features a cube shape with beveled top outside edges, and a belt-like area on the lower portion of the cover encompassing the entire circumference and the top of the belt-like area is aligned with a rib of the fuel tank. The carburetor cover features four ribs along its outside edge and a receded area where control levers are located. The

---

[1] Application Serial No. 78924545 was filed on July 7, 2006 under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), on the basis of Applicant's claim of first use in October 1983 and first use in commerce in December 1984.

> fuel tank is roughly rectangular. The engine features a beveling that runs around its top circumference.

Color is not claimed as a feature of the mark. Applicant has disclaimed the exclusive right to use "the design mark's purely functional components, namely levers, bolts, nuts and caps."

Three companies, Cummins Inc. ("Cummins"), Briggs & Stratton Corporation ("Briggs & Stratton"), and Kohler Company ("Kohler" or "Opposer"), filed separate oppositions to registration of Applicant's claimed mark.[2] The Cummins opposition was dismissed and the Briggs & Stratton and Kohler oppositions were consolidated on February 9, 2012, with the Briggs & Stratton opposition designated as the "parent" case. Following the parties' submission of evidence and briefs, and shortly before the scheduled oral hearing, Briggs & Stratton and Applicant settled and stipulated to dismissal of Opposition No. 91200832 with prejudice. 226 TTABVUE 2.[3] The Board dismissed that opposition. 228 TTABVUE.

Kohler's Opposition No. 91200146 remains for decision. The case is fully briefed and the parties appeared at an oral hearing before the panel on January 24, 2017. We sustain the opposition on two of the four pleaded claims and do not reach the others.[4]

---

[2] Cummins filed Opposition No. 91187217, Kohler filed Opposition No. 91200146, and Briggs & Stratton filed Opposition No. 91200832.

[3] Because the entire trial record is in the file of the now-dismissed Opposition No. 91200832, citations in this opinion are to the TTABVUE docket in that case. References in this opinion to "Opposer" may include Briggs & Stratton as well as Kohler, as the context requires.

[4] "Like the federal courts, the Board has generally used its discretion to decide only those claims necessary to enter judgment and dispose of the case. . . [T]he Board's determination

## I.   Prosecution History, Pleadings, and Evidentiary Record

### A.  Prosecution History

The prosecution history of the opposed application is lengthy. We describe it below in some detail because it bears on several issues in this opposition and because Applicant's evidence of acquired distinctiveness made of record during prosecution in support of its claim to registration under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), is automatically of record in this proceeding, subject to any objections. Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b). *See also AS Holdings, Inc. v. H & C Milcor, Inc.*, 107 USPQ2d 1829, 1831 (TTAB 2013) (citing *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 92 USPQ2d 1626, 1628-29 (Fed. Cir. 2009)).

After Applicant filed its application, the Examining Attorney issued a first Office Action refusing registration on the ground that Applicant's claimed mark is a non-distinctive configuration of the goods that does not function as a mark under Sections 1, 2, and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, 1127.

Applicant responded by amending its application to seek registration under Section 2(f) of the Trademark Act, and made of record: (1) a declaration of Scott Conner, the Assistant Vice President of Applicant's subsidiary American Honda Motor Company, Inc. ("American Honda"), attesting to the sales of "GX engines"

---

of registrability does not require, in every instance, decision on every pleaded claim." *Multisorb Tech., Inc. v. Pactiv Corp.*, 109 USPQ2d 1170, 1171 (TTAB 2013).

bearing the design shown in the application in the United States since 1984,[5] setting forth revenue and advertising figures for GX Engines and for products incorporating GX Engines, for periods between 2000-2006, and attaching brochures and photographs showing the design; and (2) 16 "Distributor Statement[s]" from distributors of the GX Engines.

The application was approved for publication, but the Examining Attorney then withdrew the application from publication and issued a second Office Action requiring Applicant to submit a description of the mark "to clarify what the applicant seeks to register." Applicant responded: "The mark consists of the configuration of an engine. The 'phantom' lining shown in the drawing is not part of the mark and serves only to indicate position." Applicant submitted an amended drawing of its mark in which a portion was shown in dotted lines. The application was again approved for publication and subsequently published for opposition on March 25, 2008.

Four months later, the Commissioner for Trademarks notified the Examining Attorney of a Letter of Protest claiming that the matter presented for registration appeared to be functional, and that the Letter of Protest had been accepted by the Commissioner, who had determined that a clear error had been made in allowing publication. The Commissioner restored jurisdiction over the application to the Examining Attorney to take appropriate action on the Letter of Protest.

---

[5] The parties have referred to this engine as the "GX Engine" in their briefs and we will do so as well except where otherwise indicated.

The Examining Attorney issued a third Office Action now refusing registration of Applicant's claimed mark under Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5), because it was a functional design for the goods. The Examining Attorney also requested that Applicant provide certain information and documentation regarding the claimed mark.

Applicant responded to the third Office Action by submitting declarations disputing the functionality of the GX Engine.[6] The Examining Attorney issued a fourth Office Action withdrawing the functionality refusal and requesting that Applicant provide a more detailed description of its mark. Applicant provided the following description of its mark in its response: "The mark consists of the configuration of an engine with a slanted fan cover, the fuel tank located above the fan cover on the right, and the air cleaner located above the fan cover on the left. The broken lining in the drawing is not part of the mark and serves only to indicate position." The application was again approved for publication.

The application was again withdrawn from publication, however, and remanded to the Examining Attorney.[7] The Examining Attorney issued a fifth Office Action reinstating the functionality refusal, rejecting Applicant's evidence, and referring to three of Applicant's patents that had previously been made of record. The Examining Attorney noted that the mark might be registrable if Applicant limited its claimed mark to the following elements: "The overall 'cubic' look of the engine; the shape of

---

[6] Statements made in these declarations "are not testimony on behalf of [Applicant] . . ." Trademark Rule 2.122(b)(2), 37 C.F.R. § 2.122(b)(2).

[7] February 5, 2010 Office Action at 1.

the air cleaner housing; the design of the carburetor cover; the shape and size of the fuel tank; the combined and complementary shape of the fuel tank and air cleaner housing; and the positioning and orientation of the major engine components."[8] The Examining Attorney requested a new description of the claimed mark and an amended drawing.

Applicant responded by submitting a new description of its claimed mark in the form currently in the opposed application. Applicant declined to submit a new drawing on the ground that while "there were functional portions of the design, the shape and position of such portions constitutes part of the design."[9] The Examining Attorney issued a sixth Office Action accepting Applicant's amended description of its mark, but making final the requirement for an amended drawing.

Applicant filed a Request for Reconsideration requesting that the Examining Attorney enter a statement in the application that the "design mark does not include the purely functional components, namely, levers, bolts, nuts, and caps." The statement was entered and the application again was published for opposition.

**B. Pleadings**

Opposer filed a Second Amended Notice of Opposition on February 2, 2013.[10] It alleges that Applicant's claimed mark is primarily functional, under Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5);[11] has not acquired distinctiveness under

---

[8] February 5, 2010 Office Action at 1.

[9] August 4, 2010 Response to Office Action at 1.

[10] 46 TTABVUE.

[11] ¶¶ 6, 8-10.

Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f);[12] is generic;[13] and has been abandoned.[14] Applicant answered,[15] denying Opposer's material allegations.

### C. Evidentiary Record

The evidentiary record is voluminous, comprising more than 5,000 pages of testimony, exhibits, and other documentary evidence. It consists of the pleadings discussed above, the file of the involved application, by operation of Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1), and various types of evidence made of record by the parties during their respective testimony and rebuttal periods, or otherwise by agreement of the parties.

Most of the parties' evidentiary submissions, as well as their briefs, have been filed in both a redacted (public) version, and an unredacted (confidential) version under seal, because they contain material that the parties designated as "Confidential" or "Attorneys' Eyes Only" under a stipulated Confidentiality and Protective Order filed by the parties and approved by the Board.[16] Under the terms

---

[12] ¶¶ 4-5, 7. Opposer's pleaded claim is that Applicant's mark is not distinctive under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1). To conform to the claim pursued by Opposer and defended by Applicant at trial, and given Applicant's admission during prosecution that its applied-for mark is not inherently distinctive, but has acquired distinctiveness, we construe this claim as pleading that Applicant's mark has not acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f).

[13] ¶¶ 4-5, 7, 15.

[14] ¶¶ 11-14.

[15] 89 TTABVUE.

[16] 8/9 TTABVUE. In our description of the record below, the public and confidential versions of filings are identified by two citations to the TTABVUE file (e.g., 162/163 TTABVUE), with the first number identifying the public version of a filing and the second and any additional numbers indicating the confidential version(s). In some instances noted below, there is no publicly accessible version of a filing, or there is an incomplete one (e.g., exhibits without accompanying testimony). Except where otherwise indicated, citations in this opinion to

of the Protective Order, materials designated as Confidential are "to be shielded by the Board from public access." 8 TTABVUE 6.

This obligation presents a significant challenge in discussing the evidence in a publicly accessible opinion. The difficulty is compounded by the extensive and, in many instances, indiscriminate, designation of entire deposition transcripts and other materials as Confidential without any apparent basis for the designation, as perhaps revealed by the fact that some testimony and materials designated as Confidential have been discussed, quoted, or cited by one or both of the parties in their publicly accessible briefs.[17]

Confidentiality designations do not provide absolute immunity from the public disclosure of materials so designated. *See Noble House Home Furnishings, LLC v. Floorco Enters., LLC*, 118 USPQ2d 1413, 1416 n.21 (TTAB 2016) (the Board must be able to discuss the record evidence in its opinions unless there is an overriding need for confidentiality). *Cf.* Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g) ("The Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party."). Accordingly, while

---

specific pages in the record and in the parties' briefs are to the public versions of the filings, and citations to testimony are to the internal pages and lines of the pertinent transcript (e.g., Tr. 131:18-132:6), with identification of the witness if required, rather than to the corresponding TTABVUE pages. We will use the term "Confidential" to describe the parties' designations of testimony and documents as either "Confidential" or "Attorneys' Eyes Only."

[17] Where, in any publicly accessible filing, a party has cited, quoted from, or described, without redaction, testimony or documents designated by it as Confidential, we have treated this as a waiver of its claim of confidentiality. Where, in any publicly accessible filing, a party has cited, quoted from, or described, without redaction, testimony or documents designated by its adversary as Confidential, and the adversary has not subsequently objected, we have also treated this as a waiver of the adversary's claim of confidentiality as to the content and subject matter of the pertinent materials.

we will give appropriate consideration to the parties' designations of evidence as Confidential, we will not be bound by inappropriate designations and "in this opinion, we will treat only testimony and evidence that is truly confidential or commercially sensitive as such." *Noble House*, 118 USPQ2d at 1416 n.21.[18]

## 1. Opposer's Evidence

### a. Trial Testimony:

● Testimony deposition of Dr. John Reisel, an expert witness on functionality, and exhibits thereto (164/165 TTABVUE);

● Testimony deposition of Jeff Whitmore, a Briggs & Stratton engineer, and exhibits thereto (166/171 TTABVUE);

● Testimony deposition of Cameron Litt, a Kohler employee, and exhibits thereto (162/163 TTABVUE); and[19]

● Testimony and rebuttal testimony depositions of Hal Poret, a marketing expert witness who conducted a survey, and exhibits thereto (199 TTABVUE);

---

[18] Where necessary to protect such evidence from disclosure, we have summarized it in general terms.

[19] Opposer did not file a redacted version of the transcript of Mr. Litt's testimony deposition. Opposer also did not file redacted versions of Applicant's responses to certain requests for admission, and the deposition excerpts referenced in Opposer's Second, Third, Fourth, and Fifth Notices of Reliance. Applicant did not file redacted versions of the deposition transcripts of Motohiro Fujita and Scott Conner, the discovery depositions of Peter Hotz and Mr. Fujita, the prior testimony of Kevin Hoag, and Briggs & Stratton's responses to certain requests for admission. "[B]ecause it is the general policy of the Board that all papers in a proceeding be public, Opposer[] and Applicant are allowed until thirty days from the date of this decision in which to submit redacted versions of these [materials], failing which they will be treated as part of the public record." *Ayoub, Inc. v. ACS Ayoub Carpet Serv.*, 118 USPQ2d 1392, 1398 n.39 (TTAB 2016).

**b. Notices of Reliance:**

● First Notice of Reliance on Applicant's admissions in response to Briggs & Stratton's First, Second, Fourth, Fifth, and Sixth Sets of Requests for Admission (Requests for Admission Nos. 1-353 and exhibits thereto), Applicant's Supplemental Responses to Briggs & Stratton's Fifth Set of Requests for Production of Documents, and a copy of a December 16, 2005 Decision of the Second Board of Appeal of the Office for Harmonization in the Internal Market (Trade Marks and Designs) on an application filed by Applicant to register a three-dimensional trademark in the European Union (114/116 TTABVUE);

● Second Notice of Reliance on Internet pages showing third-party engines and Applicant's marketing and sale of the GX Engine, and excerpts of a deposition of expert witness Kevin L. Hoag taken in a prior litigation involving American Honda, by stipulation of the parties (117/118 TTABVUE);[20]

● Third Notice of Reliance on excerpts from the discovery deposition of Applicant's Rule 30(b)(6) designee Yukio Sugimoto, and certain exhibits thereto, by agreement of the parties (122/123 TTABVUE);

● Fourth Notice of Reliance on excerpts from the discovery deposition of John Lally, an employee of Applicant, and certain exhibits thereto, by agreement of the parties (121/124 TTABVUE);

---

[20] The parties entered into a number of stipulations and agreement regarding the presentation of evidence. 104 TTABVUE; 119 TTABVUE; 120 TTABVUE; 140 TTABVUE.

● Fifth Notice of Reliance on a page from the discovery deposition of Applicant's Rule 30(b)(6) designee Motohiro Fujita and an exhibit thereto (125/126 TTABVUE);

● Sixth Notice of Reliance on various of Applicant's United States patents and Japanese utility model applications (127/128 TTABVUE);

● Seventh Notice of Reliance on excerpts from the discovery deposition of Kohler employee Manuel Rumao and an exhibit thereto, by agreement of the parties, and an exhibit from the discovery deposition of Briggs & Stratton employee Peter Hotz (167/168 TTABVUE);

● Eighth Notice of Reliance on additional excerpts from the deposition of Mr. Hoag taken in the above-mentioned prior litigation involving American Honda (169/170 TTABVUE);

● Ninth Notice of Reliance on excerpts from the discovery deposition of Mr. Hotz (172/173 TTABVUE);

● Tenth Notice of Reliance on excerpts and exhibits from the discovery deposition of Mr. Conner (174/175 TTABVUE);

● Eleventh Notice of Reliance on pp. 201-216 from an article by Shari Seidman Diamond, a professor at Northwestern University School of Law, entitled "Control Foundations: Rationales and Approaches" from *Trademark and Deceptive Advertising Surveys, Law, Science, and Design* (2012) (176 TTABVUE);[21]

---

[21] Opposer offers these pages from Professor Diamond's article as part of a printed publication. 176 TTABVUE 3. Applicant similarly offered portions of the Reference Guide on Survey Research from the Reference Manual on Scientific Evidence, also written by Professor Diamond, under notice of reliance as printed publications. 141 TTABVUE. In the absence of any objections, we will consider these materials for substantive guidance on the survey issues discussed below.

● Twelfth Notice of Reliance on excerpts from the prosecution history of United States Patent No. 4,813,385 (177 TTABVUE);

● Thirteenth Notice of Reliance on certain Internet pages regarding the marketing and sale by third parties of GX Engines with cyclone air cleaners (178 TTABVUE); and

● Fourteenth Notice of Reliance on advertisements for Briggs & Stratton engines, Kohler engines, and third-party engines, as well as GX Engines, including from Applicant's websites and third-party websites (178 TTABVUE).

**c. Witness Declarations:**

● Declarations of Brad Murphy, Larry Cotton, Denis Bedard, and Allen Gillette, employees of third-party engine manufactures, by agreement of the parties (130/131 TTABVUE).

**2. Applicant's Evidence**

**a. Trial Testimony**:

● Testimony deposition of Mr. Fujita, and exhibits thereto (202 TTABVUE);

● Testimony deposition of Mr. Conner, and exhibits thereto (188/186/189 TTABVUE);

● Testimony deposition of George Mantis, a marketing expert witness who conducted a survey, and exhibits thereto (185 TTABVUE); and

● Testimony deposition of James Mieritz, an expert witness on functionality, and exhibits thereto (197/196 TTABVUE);

**b. Notices of Reliance**:

● First Notice of Reliance on excerpts from the discovery deposition of Mr. Hotz, and certain exhibits thereto (154/155 TTAB);

● Second Notice of Reliance on the discovery deposition of Manuel Rumao, and exhibits thereto, filed by stipulation of the parties (156/155 TTABVUE);

● Third Notice of Reliance on Briggs & Stratton's Second Supplemental Responses to certain interrogatories in Applicant's First and Second Sets of Interrogatories (152/151 TTABVUE);

● Fourth Notice of Reliance on Kohler's Second Supplemental Responses to certain interrogatories in Applicant's First and Second Sets of Interrogatories (150/159 TTABVUE);

● Fifth Notice of Reliance on Briggs & Stratton's admissions in response to certain requests in Applicant's First Set of Requests for Admission (149/148 TTABVUE);

● Sixth Notice of Reliance on Kohler's admissions in response to certain requests in Applicant's First Set of Requests for Admission (147 TTABVUE);

● Seventh Notice of Reliance on the certificate of registration of Community Trademark No. 003365988 (146 TTABVUE);

● Eighth Notice of Reliance on various court documents from prior civil litigation between Applicant or American Honda, and third parties (150 TTABVUE);

● Ninth Notice of Reliance on counter excerpts from the discovery deposition of Mr. Fujita, and certain exhibits thereto (145/144 TTABVUE);

- Tenth Notice of Reliance on counter excerpts from the deposition of Mr. Hoag in earlier civil litigation, and his expert report, by agreement of the parties (143/142 TTABVUE); and

- Eleventh Notice of Reliance on certain pages from Professor Diamond's *Reference Guide on Survey Research, Reference Manual on Scientific Evidence* (2d ed. Federal Judicial Center 2000) and (3d ed. Federal Judicial Center 2011) (141 TTABVUE).

## II. Evidentiary Objections

The parties devote more than 30 pages of their briefing at final hearing to numerous detailed evidentiary objections.[22] As a general matter, "the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence, including any inherent limitations," and keeping in mind "the various objections raised by the parties" in determining the probative value of objected-to testimony and evidence. *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1479 (TTAB 2017). To the extent necessary, we decide below the parties' major evidentiary objections going to the admissibility, rather than the weight, of certain evidence.

---

[22] Applicant also renewed a pre-trial motion to strike portions of Mr. Whitmore's testimony, to which the parties had already devoted more than 40 pages of briefing. 208 TTABVUE 64 n.3.

### A. Applicant's Objections to Admissibility of Japanese Utility Model Applications[23]

Applicant objects to the admission of copies of Japanese-language and translated versions of 14 Japanese utility model applications filed by Applicant with the Japanese Patent Office and made of record under Opposer's Sixth Notice of Reliance. The bases for the objection are that the rationales for the relevance of United States utility patents and applications set forth in *Valu Eng'g Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1429 (Fed Cir. 2002), do not apply to foreign patent documents because foreign patents do not cover the United States and implicate non-U.S. law, and because the Japanese utility model system has no counterpart in United States law and it is not clear whether the Japanese applications were ever examined or ever issued. 208 TTABVUE 71-72.

Opposer argues that these materials should be considered under *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 58 USPQ2d 1001 (2001), and *Valu Eng'g*, given the evidentiary significance of the statements made by Applicant, and that Applicant's statements in the Japanese applications were admissions. 209 TTABVUE 42.

The admissibility of foreign utility model applications appears to be an issue of first impression for the Board, as the parties have not cited, and we have not found, any applicable Federal Circuit or Board cases. In *Valu Eng'g*, the Federal Circuit held

---

[23] The Japanese utility model system protects the utilitarian shape or structure of a device for a shorter term than under the Japanese patent system. 208 TTABVUE 71-72; 209 TTABVUE 42-43.

that "an abandoned patent application should be considered under the first *Morton-Norwich* factor, because an applied-for utility patent that never issued has evidentiary significance for the statements and claims made in the patent application concerning the utilitarian advantages, just as an issued patent has significance." 61 USPQ2d at 1429. Although non-U.S. patents do not appear to have been at issue in that case, this rationale is not jurisdiction-specific, and we note that the analysis of any statements or claims made by Applicant in its Japanese utility model applications does not require us to understand or apply Japanese law.[24] Instead, that analysis requires us to do what we must do in considering Applicant's issued United States patents—determine whether the claims and disclosures in the patent show the utilitarian advantages of the design sought to be registered as a trademark. *See, e.g., In re Becton, Dickinson and Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1377 (Fed. Cir. 2012). Indeed, this is what we do in examining an applicant's statements in advertising in functionality cases as well. We overrule Applicant's objection and have considered the utility model applications for whatever probative value they may have on the issue of functionality.

---

[24] *See Alphaville Design, Inc. v. Knoll, Inc.*, 627 F. Supp. 2d 1121, 1132-33 (N.D. Cal. 2009) (court reviewed two expired foreign patents to determine whether defendant and counterclaimant had committed fraud on the Patent and Trademark Office by failing to disclose the foreign patents); *Franek v. Walmart Stores, Inc.*, 2009 WL 674269, at *14 (N.D. Ill. Mar. 13, 2009) (court analyzed the impact of a foreign patent on the functionality of the plaintiff's circular beach towel design), *aff'd sub nom., Jay Franco & Sons, Inc. v. Franek*, 96 USPQ2d 1404 (7th Cir. 2010).

**B. Applicant's Objections to Admissibility of Foreign Trademark Documents**

Applicant objects to the admission of two documents that it alleges are irrelevant that were made of record under Opposer's First Notice of Reliance: (1) a copy of the December 16, 2014 Decision of the Second Board of Appeal of the Office of Harmonization in the Internal Market (Trademarks and Designs) ("OHIM")[25] affirming a refusal to register a three-dimensional depiction of the GX Engine shown in Applicant's Community Trademark Application No. 3 365 996, and (2) a copy of a May 30, 2005 filing by Applicant's Turkish counsel with a Turkish court in support of a request for a precautionary injunction against a Turkish company that Applicant claimed was selling water pumps containing counterfeits of the GX Engine. 116 TTABVUE 408-414, 457-473 (Confidential Version).

Opposer argues that it does "not rely on the objected-to foreign trademark documents for any legal conclusions or application of 'foreign trademark standards,'" but rather on the OHIM "tribunal's observation that the vertical and horizontal planes of the GX engine are 'in line' in order to create a more compact engine," and the statements made by Applicant's counsel in the Turkish litigation "that the GX engine is 'renowned … for occupying little space' and that the red, white, and black color combination is the 'most important feature' of the GX engine trade dress," which Opposer claims are admissions by Applicant. 209 TTABVUE 40.

---

[25] On March 23, 2016, OHIM's name was changed to the European Union Intellectual Property Office.

The portion of the OHIM decision cited by Opposer contains the tribunal's summary of Applicant's arguments about the features of its three-dimensional engine shape and its finding regarding the lack of inherent distinctiveness under European Community law, 114 TTABVUE 176, an issue that is not before us and on which European Community law is at odds with United States law.[26] We sustain Applicant's objection to its admissibility, and have given it no consideration in our decision.

The statements regarding the constituent elements of Applicant's trade dress, and its recognition around the world, made by Applicant's Turkish counsel, are, however, factual statements made by an authorized agent of Applicant that do not implicate Turkish law. We overrule Applicant's objection to the admissibility of these statements, and have considered them for whatever probative value they may have on the issues of functionality and acquired distinctiveness.

### C. Opposer's Objections to Admissibility of Court Documents From Prior Civil Infringement Litigation Between Applicant or American Honda, and Third Parties

Opposer objects to the admission of copies of documents from the files of two civil trade dress infringement suits against third parties, *Powertrain, Inc. et al. v. Am. Honda Motor Co.*, Case No. 1:03-cv-00688-MPM in the United States District Court for the Northern District of Mississippi, and *Honda Motor Co. v. The Pep Boys, et al.*, Case No. 2:05-cv-00879-WDK-VBK in the United States District Court for the Central District of California, made of record under Applicant's Eighth Notice of Reliance.

---

[26] Under United States trademark law, product designs can never be inherently distinctive. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 54 USPQ2d 1065, 1069-70 (2000).

157 TTABVUE. Specifically, these documents comprise jury instructions, a completed jury verdict form, and a permanent injunction from the *Powertrain* case, and an order on cross-motions for summary judgment in the *Pep Boys* case. Applicant claims that these documents are "relevant to the non-functionality and secondary meaning of the applied-for mark in this proceeding." 157 TTABVUE 3. Opposer objects to their admission principally on the ground that the trade dress at issue in the civil cases was three-dimensional in nature and involved "many features which are not claimed in the applied-for mark." 204 TTABVUE 64. Applicant makes four arguments for the admissibility of these documents: (1) the three-dimensional trade dress at issue in the civil cases "included the two-dimensional, front view of the GX that is the subject of this proceeding," 208 TTABVUE 61; (2) Opposer relied on testimony, documents, and settlement agreements from the two litigations, including on its motion for summary judgment on the issue of functionality; (3) the proffered litigation documents "provide context for the documents and testimony relied upon by Opposer;" and (4) Opposer failed to object to "numerous exhibits relating to intentional copying of the GX trade dress introduced during Mr. Conner's trial testimony." 208 TTABVUE 62.

The three-dimensional trade dress claimed by Applicant and American Honda in the *Powertrain* and *Pep Boys* cases, and referred to in the objected-to documents, differed significantly in scope from Applicant's applied-for mark.[27] In contrast to

---

[27] For example, in the summary judgment order in the *Pep Boys* case, the court listed 14 claimed non-functional elements of the GX Engine trade dress: "(1) the valve cover shape and design; (2) the fan cover shape, including a unique combination of angular and rounded edges, and the shape of the air guide portion of the fan cover; (3) the fuel tank size and shape; (4)

statements made by a party or its authorized representative about an issue or fact relevant here, *decisions* by other courts based upon different factual records and concerning a different claimed trade dress are not relevant in this proceeding. *See Citigroup Inc. v. Capital City Bank Grp. Inc.*, 94 USPQ2d 1645, 1665-66 (TTAB 2010), *aff'd,* 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011) (finding in opposition that fame of opposer's marks had not been established on the basis of a prior court decision and had to be established on the record in the opposition, which the applicant had the chance to challenge); Fed. R. Evid. 401. We sustain Opposer's objections to the admissibility of these documents from the *Powertrain* and *Pep Boys* cases with respect to the issue of "the non-functionality and secondary meaning of the applied-for mark in this proceeding," 157 TTABVUE 3, and have given them no consideration in our decision.

### D. *Daubert* Motions

Both parties seek to exclude expert testimony under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 27 USPQ2d 1200 (1993). Opposer seeks to exclude two portions of Mr. Mieritz's testimony, 204 TTABVUE 57-64, while Applicant seeks to exclude all of Dr. Reisel's testimony. 208 TTABVUE 64-68.

---

the engine oil fill cap color; (5) the muffler heat shield design; (6) the oil alert system placement; (7) the location, shape, and design of the oil fill cap and drain cap; (8) the number, location, and size of the air cooling fins; (9) the trapezoidal shape and size of the base pad; and (10) the relative position and orientation of each of the major engine components," as well as "(1) the air cleaner housing, including the wing-nut design; (2) the carburetor cover, including the shape, plastic ribs, label placement, control placement, bolt locations, and bolt orientation; and (3) the combined and complimentary shape of the fuel tank, air cleaner housing, and muffler heat shield, each with a unique beveled edge angled to the outside of the engine and straight edge facing inward; and (4) the design and orientation of the fuel tank mount."

Under *Daubert*, the Board, like a federal district court, "acts as a 'gatekeeper' and determines the admissibility of expert testimony and the qualifications of expert witnesses" and "has 'broad discretion in determining whether to admit or exclude expert testimony.'" *Corporacion Habanos, S.A. v. Guantanamera Cigar Co.*, 102 USPQ2d 1085, 1094 (TTAB 2012) (quoting *U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010)). Our gatekeeper function, however, necessarily differs somewhat from that of a court given the nature of Board litigation.

A key goal of the gatekeeper in many court cases is to keep unreliable expert testimony from a jury. *See, e.g., Cook ex. Rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1111 (11th Cir. 2005) ("[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse."). That concern is not applicable here because there is no jury waiting behind the gate.

*Daubert* also applies to non-jury trials, but in that context we find instructive the statement of the Seventh Circuit in *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006), that where "the factfinder and the gatekeeper are the same, the [trial] court does not err in admitting evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standards of reliability established by Rule 702." The application of this approach seems especially sensible in Board proceedings, where there are no pre-trial motions *in limine*, and *Daubert* motions are not considered until

a case is ready for decision and the entire evidentiary record is under review. Trademark Rule 2.123(j), 37 C.F.R. § 2.123(j). *See* 181 TTABVUE.

We will thus exercise our discretion to admit or exclude expert testimony under *Daubert* mindful of the fact that the "Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence, including any inherent limitations" while taking into account "the various objections raised by the parties" and according "whatever probative value the subject testimony and evidence merit." *Luxco*, 121 USPQ2d at 1479.

### 1. Mieritz Testimony Regarding Comparative Engine Performance, Cost, and Quality

Opposer first seeks to exclude Mr. Mieritz's responses to a series of questions "regarding the comparison of components of the Honda GX engine to components of other engines in the market with respect to performance, quality and manufacturing cost." 204 TTABVUE 58.

Opposer does "not question Mieritz's qualifications to render opinions in this category of testimony" but argues that his "testimony lacks reliability as it is not based on sufficient facts or data, nor is it the product of reliable principles and methods reliably applied to the facts of the case." 204 TTABVUE 58. In Opposer's view, Mr. Mieritz's opinions "were nothing more than conclusory answers that lack factual foundation and analytical support" because he did no comparison testing between the engines or any other product testing, did not speak with Applicant's engineers before forming his opinions, and did not review or even ask for documents or data relevant to the issues on which he opined. 204 TTABVUE 61-62.

Applicant responds that Mr. Mieritz was employed by Briggs & Stratton in a variety of positions for over 40 years and developed and tested engines, including engines made by Briggs & Stratton's competitors, and that Rule 702 of the Federal Rules of Evidence "'specifically contemplates the admission of testimony by experts whose knowledge is based on experience.'" 208 TTABVUE 56 (quoting *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000)). Applicant cites the Advisory Note to Rule 702 and cases that have qualified experts, and admitted their testimony, on the basis of their experience rather than data, 208 TTABVUE 57, and argues that Mr. Mieritz "had ample support for his opinions comparing the general performance and costs of each component comprising the GX to its competitors based on his substantial direct experience designing engine components, analyzing manufacturing costs and incorporating such consideration of manufacturing costs into the design and development process, and testing competitor engines in the ordinary course of his over 40 years of work with Briggs." 208 TTABVUE 58-59.

Rule 702 of the Federal Rules of Evidence, made applicable to Board proceedings by Rule 2.122(a) of the Trademark Rules of Practice, 37 C.F.R. § 2.122(a), provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

We overrule Opposer's objection. Mr. Mieritz's experience with engines, including the GX Engine, while working for Briggs & Stratton, gives him a sufficient basis to compare generally the performance, quality, and manufacturing costs of the GX Engine and competitive engines so long as his specific opinions are not based upon a subjective belief or unsupported speculation. *Corporacion Habanos*, 102 USPQ2d at 1095. Opposer's objections to: (1) testimony in which he acknowledged not having seen data regarding the differences in the performance and manufacturing cost of the fan covers of the various engines,[28] (2) testimony regarding performance, cost, and quality of engine components,[29] (3) testimony regarding the comparative quality of the fuel tanks of the various engines, in which he "assume[s] they all perform the same as the Honda,"[30] and (4) testimony that he "feel[s] that the [Briggs & Stratton Vanguard] air cleaner cover performs -- equally as well as the Honda air cleaner cover,"[31] go to the weight to be accorded his testimony, not its admissibility. We agree with the observation of the court in *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010), that our "[d]etermination on admissibility should not

---

[28] Tr. 45:10-25.

[29] Tr. 32:4-20; 43:15-44:2; 44:23-45:5; 55:20-24; 56:25-57:11; 68:12-19; 68:20-69:1; 74:25-75:5; 75:6-10; 75:11-15; and 75:16-20.

[30] Tr. 32:21-33:8.

[31] Tr. 55:25-56:24.

supplant the adversarial process; shaky expert testimony may be admissible, assailable by its opponents through cross-examination." (Internal quotation marks omitted). We therefore have considered these portions of the Mieritz testimony for whatever probative value they may have.

### 2. Mieritz Testimony Regarding Industry Recognition of GX Engine

Opposer also objects to Mr. Mieritz's testimony "about his perception of the market recognition of the GX engine appearance." 204 TTABVUE 62. That testimony is set forth below:

> Q. During your time at Briggs & Stratton, did you have an opportunity to speak with any OEMs, distributors or dealers about competitors' engines?
> A. Yes, I did.
> Q. For what purpose?
> A. We would -- I would go to the OEMs, distributors and dealers with our sales and marketing people periodically. I was there usually with a new engine or we're trying to get a new customer. I was there as engineering support.
> Q. Approximately how many times did you speak to OEMs, distributors or dealers about competitor engines during your time at Briggs?
> A. OEMs, I visited approximately 20 times. Distributors, maybe ten times. Dealers, I would often go off on my own and talk to dealers. And it might be over 100 times.
> Q. Did you ever discuss the Honda GX engine in any of those conversations?
> A. Yes, we did.
>
> * * * * *
> Q. Based on those conversations, did you observe the extent to which people in the industry recognized the look of the GX engine?
> Mr. Nowakowski: Objection. Foundation.
> A. Yes. I discussed with them the overall look of engines.
> Q. And what was your observation with that respect?
> Mr. Nowakowski: Same objection.

> A. In discussing with them and even colleagues, it became apparent that the Honda engine, the overall look was easily identified throughout the industry.
> Q. Based on your --
> Mr. Nowakowski: I'd also object on hearsay grounds.[32]

Opposer argues that Mr. Mieritz is not an expert in consumer or market research and did not conduct a consumer survey, and that his testimony regarding consumer recognition is outside the area of his expertise and not the product of reliable principles and methods, as required by Rule 702(c) of the Federal Rules of Evidence. Opposer also claims that his testimony is inadmissible as lay opinion testimony under Rule 701 of the Federal Rules of Evidence.

This portion of Mr. Mieritz's testimony goes to the recognition of the GX Engine by OEMs, distributors, and dealers, and thus implicates their state of mind. Mr. Mieritz is not qualified as an expert on consumer perception, and he did not employ generally accepted research methodology or techniques in any event. His testimony is thus inadmissible under *Daubert* as expert testimony. *See Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1756-57 (TTAB 2013) (professional travel writer and editor, who qualified as an expert in the field of travel writing and journalism, was not qualified to render opinions regarding whether the average traveler perceived "Annapolis Tours" as a generic term based upon telephone and online conversations about visiting Annapolis, Maryland), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014); *Corporacion Habanos*, 102 USPQ2d at 1095-96 (excluding testimony of tobacconist regarding perception of GUANTANAMERA brand in United

---

[32] Tr. 96:12-97:8; 97:20-98:11.

States because even though he was qualified as an expert in the advertising and selling of Cuban cigar brands in the United States to render an opinion on that topic, his opinion was based upon "conversations with customers and other tobacconists over an unspecified period of time," an unreliable "technique" under *Daubert*).

It is also inadmissible as lay opinion testimony. Mr. Mieritz's testimony purports to reflect his subjective assessment of the collective state of mind of OEMs, dealers, and distributors regarding their recognition of the three-dimensional appearance of the GX Engine over a decade ago,[33] based solely upon "discussi[ons] with them and even colleagues." Tr. 96:12-97:8; 97:20-98:11. The details of the discussions that led him to conclude that "the overall look was easily identified throughout the industry" are not documented or otherwise specified, and we cannot determine, from Mr. Mieritz's vague references to numerous conversations during his career, whether his opinion "is rationally based on the witness's perception." Fed. R. Evid. 701(a). We sustain Opposer's objections to these portions of Mr. Mieritz's testimony, and have given them no consideration in our decision.

### 3. Reisel Testimony

Applicant seeks to exclude the entire testimony of Opposer's expert John Reisel— a Ph.D in mechanical engineering and a tenured professor of mechanical engineering at the University of Wisconsin-Milwaukee—on the ground that he is not qualified to opine on the functionality of the applied-for mark. 208 TTABVUE 64-68. Applicant argues that Dr. Reisel lacks the requisite academic training in engine design and the

---

[33] Mr. Mieritz has been retired and out of the engine industry since 2006. Tr. 138:20-22.

external appearance of engines; has never designed an engine or an engine component; has never studied or taught the external design of engines or engine manufacturing costs; and has had only limited exposure to the GX Engine and third-party horizontal shaft engines; and that while he may be "an expert on engine emissions or other aspects of mechanical engineering … such expertise has nothing to do with knowing and understanding the factors regarding the external appearance of a horizontal shaft engine." 208 TTABVUE 66-68. Applicant cites several cases involving the disqualification of experts, but relies in particular on *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378 (D. Md. 2001), in which the court excluded the expert testimony of a mechanical engineer on the ground that he was not qualified as an expert on the particular issue before the court and had not applied reliable scientific methodology in arriving at his opinions. 208 TTABVUE 65.

Opposer responds that Dr. Reisel is qualified to opine about the claimed functionality of the applied-for mark by virtue of his education and professional experience; his teaching, on 14 occasions, of a senior-level college course on internal combustion engines; his interactions with engineers at Opposer and Briggs & Stratton to familiarize himself with the particular engines at issue; and his experience with the professional literature. 209 TTABVUE 37-38. Opposer argues that his testimony regarding functionality is directed to the impact of the several components of the GX Engine on the external appearance of the engine, which is the essence of the applied-for mark. 209 TTABVUE 38.

*Shreve* collected a number of decisions on when mechanical engineers may testify as experts in "the vast field of mechanical engineering." 166 F. Supp. 2d at 392. The most instructive is *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 176 (5th Cir. 1990), in which the court did not require industry-specific expertise and knowledge, or experience in the design of the particular product at issue, for a professor of mechanical engineering to be qualified as an expert regarding safe design of the product, even though his knowledge was gained "through reviewing literature rather than through hands-on experience."

Here, Dr. Reisel's academic training in mechanical engineering, his preparation and teaching of the course on internal combustion engines, and his interactions with company engineers regarding the particular engines at issue in this case, provide a sufficient, if imperfect, "fit between [his] specialized knowledge and experience and the issues before the [Board]" to make his testimony helpful to us as the trier of fact under Rule 702. *Shreve*, 166 F. Supp. 2d at 392-93; *cf. Ancho v. Pentek Corp.*, 157 F.3d 512, 518-519 (7th Cir. 1998) (mechanical engineer not qualified to testify about manufacturing plant redesign where he had never bothered to visit plant whose reconfiguration he suggested); *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 247-250 (4th Cir. 1999) (professor of mechanical engineering not qualified to opine about design of particular automotive part where he had no experience in designing part, and did not know or learn how the part was manufactured or from what material it was manufactured, or conduct any tests or calculations regarding its strength). Like Opposer's criticisms of certain of the challenged portions of Mr. Mieritz's testimony,

Applicant's criticisms of Dr. Reisel's qualifications go to the weight to be accorded his opinions, not their admissibility. *Metavante*, 619 F.3d at 762. We overrule Applicant's objections, and have considered Dr. Reisel's testimony for whatever probative value it may have.

### E. Applicant's Renewed Motion to Exclude Whitmore Testimony

In its trial brief, 208 TTABVUE 9, Applicant renewed its pre-trial motion to strike what it described as the "undisclosed expert opinions of fact witness Jeff Whitmore." 129 TTABVUE 2. Opposer argued that Mr. Whitmore's alleged expert testimony was based upon his personal knowledge as a long-time Briggs & Stratton engineer and developer of various engines, and was thus either factual testimony or lay opinion testimony admissible under Rule 701 of the Federal Rules of Evidence, both of which are exempt from the expert disclosure requirements.

Rule 701 of the Federal Rules of Evidence provides that lay opinion testimony is permitted only if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) *not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.*" Fed. R. Evid. 701 (emphasis added). The parties have not cited, and we have not found, any precedential Board decisions on the distinction between expert opinion that is not disclosed prior to trial, and permissible lay opinion. Our primary reviewing court views this issue as a procedural one in patent cases, and applies regional circuit law to its resolution. *See, e.g., Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 57 USPQ2d 1293, 1298 (Fed. Cir. 2001) (applying Fifth

Circuit law and allowing lay opinion testimony regarding patent enablement based upon witnesses' own personal experience in oil drilling industry).

The parties have directed our attention to a number of federal court cases. We find two of them to be the most instructive because they resolved the issue in a context similar to the one before us here. In *Greenwich Indus., L.P. v. Specialized Seating, Inc.*, 2003 WL 21148389 (N.D. Ill. May 16, 2003), a trade dress infringement case, the court allowed testimony about functionality as permissible lay opinion where the witnesses claimed personal knowledge of the subject design from their prior employment. 2003 WL 21148389 at *3 (quoting Advisory Committee Notes to Fed. R. Evid. 701(a)). In *Open Text S.A. v. Box, Inc.*, 2015 WL 393858 (N.D. Cal. Jan. 29, 2015), a patent infringement case, the court allowed the lay opinion testimony of a co-owner of the defendant about the technical feasibility of a non-infringing alternative to the challenged product, holding that "'just because the underlying facts and data are technical in nature does not transform the information into 'expert testimony' when those facts are within the knowledge of the company's employee.'" *Open Text*, 2015 WL 393858 at *7 (quoting *In re Google AdWords Litig.*, 2012 WL 28068, at *5 (N.D. Cal. Jan. 5, 2012)).

We find that most of Mr. Whitmore's testimony is admissible as lay opinion under the rationales of *Greenwich* and *Open Text* because it is based upon his experience as a Briggs & Stratton engineer, including designing the Briggs & Stratton 550 series of engines, and his familiarity with competitive engines, the marketplace in which they compete, and their manner of use. These admissible portions are his testimony

about (1) the component parts necessary for a commercially viable single cylinder horizontal shaft engine and the typical configuration for such engines; (2) the considerations going into the design of a single cylinder horizontal shaft engine; (3) how the size requirements of such engines affect their design; (4) the requirements set by original equipment manufacturers for such engines; (5) the mounting of such engines in common applications; (6) the manufacturing advantages of having beveling on the air cleaner cover of the Briggs & Stratton 550 engine; (7) the functional advantages of such beveling;[34] (8) the reasons behind the positioning of various component parts and features of the Briggs & Stratton 550 engine; (9) the functional advantages and benefits of the positioning of various engine components and features; and (10) the functional disadvantages of moving or reconfiguring component parts and features of the Briggs & Stratton 550 engine.[35] We overrule Applicant's objections as to these portions of Mr. Whitmore's testimony, and have considered them for whatever probative value they may have.

---

[34] We interpret this testimony, and similar testimony about the "functional advantages" or "functional disadvantages" of various parts and features of the Briggs & Stratton 550 series engines, either as they exist or as a result of possible design changes, to pertain to the advantages or disadvantages that the actual or redesigned parts and features provide or would provide with respect to the manufacturing, operation, and marketability of the engine. These are matters within Mr. Whitmore's personal knowledge as a Briggs & Stratton engineer and a designer of the 550 series engine. We do not interpret this testimony as expressing an opinion as to whether the actual or hypothetical design makes the engine as a whole *de jure* functional. Tr. 183:20-186:10. *See Becton, Dickinson*, 102 USPQ2d at 1376 ("De facto functionality simply means that a design has a function, like the closure cap in this case. Such functionality is irrelevant to the question of whether a mark as a whole is functional so as to be ineligible for trademark protection.").

[35] Tr. 17:6-14; 18:22-19:14; 19:16-20:7; 21:25-22:4; 31:9-32:2; 36:15-25; 37:6-19, 21-38:2; 38:11-39:5; 39:6-19; 39:21-42:17; 44:11-23; 45:7-13; 45:15-46:13; 47:1-17; 47:22-48; 48:17-56:1; 60:7-15; 60:16-61:10; 183:20-184:14; 184:19-186:10.

Other portions of Mr. Whitmore's challenged testimony, however, leave the realm of informed lay opinion. These are: the claimed "industry standard" shape and configuration of engines;[36] the claimed impact on competitors from registration of applied-for mark;[37] and the claimed bases for visual distinctiveness of GX Engine.[38] We sustain Applicant's objections as to these portions of Mr. Whitmore's testimony, and have given them no consideration in our decision.

## III. General Factual Background Regarding the GX Engine and Applicant's Claimed Mark

### A. General Purpose Utility Engines

The parties both produce general purpose internal combustion utility engines, which are used in a wide variety of applications to power products such as pressure washers, lawnmowers, portable generators, tillers, and water pumps. Whitmore Tr. 18:3-11. Two such products powered by Applicant's GX Engine are shown below.



General purpose utility engines are typically sold to original equipment manufacturers ("OEMs") for use in their construction equipment, lawn and garden

---

[36] Tr. 74:16-76:18.

[37] Tr. 76:19-77:7.

[38] Tr. 182:10-15.

equipment, and other equipment. Whitmore Tr. 17:16-23. In addition to selling engines to OEMs, Applicant produces its own products as an OEM using GX Engines, and also sells GX Engines to engine distributors, rental yards, and individuals who incorporate them into products that they make or repower. Conner Tr. 19:11-20; 21:22-22:24.

### B. The Development of the GX Engine

Applicant states that it began developing the GX Engine in the early 1980s. Applicant states that its "primary performance goals were to create an engine that was more fuel efficient, lighter, and more compact than its predecessor, the 'ME' engine, which used a side-valve configuration."[39] The ME engine is depicted below:



Applicant's acknowledged performance objectives, including "installation compatibility," the ability to use the new engine in more OEM applications, and various maintenance and manufacturing considerations, are reflected in a contemporaneous project document entitled "Planning Material," which Applicant designated as Confidential.[40]

---

[39] 208 TTABVUE 11.

[40] 202 TTABVUE 252-279 (Fujita Ex. 191-A (English translation)).

Overhead valve engines in the early 1980s were more powerful than side valve engines like the ME and had other benefits, but were larger and more costly and were often unacceptable to OEMs because they exceeded their standard installation dimensions or "envelopes."[41] Applicant developed an overhead valve ("OHV") engine with the engine cylinder at an incline, which Applicant stated "offered all the advantages of an OHV engine (higher performance and better fuel economy, with the added benefits of … a lower center of gravity, reduced vibration, and more compact size.").[42] The new inclined-cylinder GX Engine also was lighter, less costly to ship, and usable in a wider range of applications inside the OEM "envelopes" for those products. 202 TTABVUE 58-59.

Applicant argues that in addition to the performance considerations discussed above, Applicant's styling group on the GX Engine project endeavored to develop a unique external appearance for the engine that was unrelated to Applicant's performance objectives. 208 TTABVUE 11-12. The portion of Applicant's website discussing the development of the GX Engine, and the "Planning Material" document, which is the only contemporaneous documentary evidence in the record regarding the GX development project, make no mention of the styling group, or of styling or design considerations per se. Applicant thus relies almost exclusively on the testimony of Mr. Fujita, who was a member of the large performance design group on the GX project, not the much smaller styling design group that was tasked with the design

---

[41] 208 TTABVUE 11; 202 TTABVUE 211.

[42] 208 TTABVUE 11.

of the GX's external appearance.[43] We find, on the basis of Mr. Fujita's testimony, that Applicant's designers evidently had external appearance in mind to the extent that they sought to design an engine with a "cubic" or square external appearance formed by the use of multiple straight lines in each constituent part, but that Applicant's primary objectives in developing the GX Engine were to design an engine that was lower in weight, compact, fuel efficient, lower in cost, easily mountable on OEM applications, durable, and easy to maintain. Tr. 20:17-23:8; 57:12-58:20.

Importantly, Applicant's website acknowledges that following the introduction of the GX Engine in the United States in 1983, manufacturers of general purpose utility engines have adopted the GX Engine's overhead-valve, inclined-cylinder concept as the de facto industry standard general utility engine. 202 TTABVUE 220.

## C. Redesign of the GX Engine

In 2008, Applicant redesigned the GX Engine to comply with so-called "Phase III" emission regulations promulgated by the Environmental Protection Agency. 208 TTABVUE 28. The redesign resulted in changes to the exterior appearance of the engine as viewed from the perspective shown in the application drawing.[44] Each party

---

[43] Tr. 12:12-14:1. Mr. Fujita testified that his understanding of Applicant's styling objectives, and the impact of the claimed design choices on the engine's performance, was based on his interactions with unidentified designers, not his own performance design work. Tr. 37:5-40:23; 47:7-17; 49:14-50:14; 51:22-24; 114:19-115:23. We have weighed his testimony accordingly.

[44] Applicant argues in a redacted portion of its publicly accessible brief that the changes to the exterior appearance of the GX Engine were not dictated by the need to comply with the new EPA regulations, but rather by other considerations. 208 TTABVUE 53. As discussed below in Section VI.C.6., we need not address this argument because we do not reach Opposer's abandonment claim based upon the redesign and the pre-2008 design that gives rise to the subject application.

provided a "before-and-after" depiction of Applicant's pre- and post-2008 engines in its brief. We reproduce below Opposer's drawings of the engines (with changes discussed below in Section VI.C.6. highlighted by arrows). 204 TTABVUE 54.





*Original Honda GX Engine*          *Redesigned Honda GX Engine*

IV.    **Standing**

Opposer has standing to oppose registration of Applicant's claimed mark because it competes directly with Applicant in the general utility engine business, and thus has a reasonable basis for a belief that it would be damaged if Applicant's claimed mark were registered. *See, e.g., Empresa Cubana Del Tabaco v. Gen. Cigar Co.,* 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *Books on Tape, Inc. v. Booktape Corp.*, 836 F.2d 519, 5 USPQ2d 1301, 1302 (Fed. Cir. 1987); *Kistner Concrete Prods. Inc. v. Contech Arch Tech. Inc.*, 97 USPQ2d 1912, 1918 (TTAB 2011).

V.   **Defining the Claimed Mark**

Before addressing the merits of Opposer's claims, "we first must define what Applicant intends to claim as a trademark," *In re Heatcon, Inc.*, 116 USPQ2d 1366, 1371 (TTAB 2015), because the parties dispute what the mark comprises.[45]

Applicant argues that it "does not seek protection of the basic configuration of an engine as suggested by Opposers; rather, as depicted and described in [Applicant's] Application, the GX Trade Dress comprises the specific styling elements of each component (e.g., the complementary lines, beveling, and shapes), which together express the overall distinctive cubic look of the GX Trade Dress." 208 TTABVUE 20. Applicant claims that "while the shape and position of the component parts is part of the GX Trade Dress, they do not alone comprise the trade dress" and that "Applicant has consistently claimed a trade dress on the overall cubic look achieved by the many styling features of the main components, which have the shape and position shown in the drawing." 208 TTABVUE 9 n.1. Applicant discusses the features of the individual components of the GX Engine in detail, 208 TTABVUE 9-10, and concludes that "[v]iewed as a whole, the complementary appearance of these components creates the *overall* distinctive cubic look of the GX." 208 TTABVUE 9.[46] In its brief, Applicant graphically highlights the "claimed overall distinctive cubic look" formed

---

[45] Their dispute pertains specifically to Opposer's functionality claim, but the proper definition of the claimed mark is also relevant to whether it has acquired distinctiveness.

[46] Applicant repeatedly characterizes the shape of the GX Engine as "cubic" as a result of the use of multiple straight lines in each constituent part. Our references to this characterization do not imply agreement with this terminology.

by these elements, including "the specific styling elements of each component," in the following modified drawing:[47]



208 TTABVUE 9.

Opposer responds that Applicant has "narrowly characteri[zed] its applied-for mark," which is "improper, as the mark consists of the totality of the drawing and description set forth in [Applicant's] trademark application." 209 TTABVUE 6. Opposer argues that "the application depicts and describes the overall configuration of the engine, including the particular locations of the main component parts (fuel tank, air cleaner cover, carburetor cover and fan cover), along with additional functional features, such as a slant in the fan cover, the 'roughly rectangular' shape of the fuel tank, and the 'cube shape' air cleaner cover." 209 TTABVUE 7.

Applicant's application "drawing depicts the mark to be registered," *Heatcon*, 116 USPQ2d at 1379 (citing Trademark Rule 2.52, 37 C.F.R. § 2.52), not its modified drawing reproduced immediately above or the words used to describe the mark in the

---

[47] We reproduce this drawing solely for purposes of illustrating Applicant's claim regarding the scope of its mark. It is not the actual application drawing.

application.[48] *See also In re Change Wind Corp.*, 123 USPQ2d 1453, 1459 n.6 (TTAB 2017) ("[T]he drawing of the mark, not the words an applicant uses to describe it, controls what the mark is."). This is the application drawing:



"Product configuration marks require special form drawings and must depict matter not claimed as part of the mark in broken lines. Broken lines must also be used to indicate placement of the mark." *Heatcon*, 116 USPQ2d at 1379. The only broken lines in Applicant's drawing depict the engine's recoil cover and rewind handle, elements that are not claimed as part of the mark and are depicted merely to show their position on the engine. None of the rest of the engine is depicted in broken lines, indicating that Applicant is indeed seeking protection of what it described as "the configuration of an engine with an overall cubic design, with a slanted fan cover, the fuel tank located above the fan cover on the right, and the air cleaner located to the left of the fuel tank." This "configuration of an engine" includes the placement

---

[48] In defining the mark that Applicant seeks to register, we consider "all elements, including those described in the application as well as those shown in the drawing page," *In re Becton, Dickinson and Co.*, 2010 WL 3164746, *2 (TTAB July 10, 2010), *aff'd*, 675 F.3d 1368, 102 USPQ2d 1372 (Fed. Cir. 2012), but we are not bound by what Applicant describes its mark to be in its application or in its brief. *Becton, Dickinson*, 102 USPQ2d at 1374; *Change Wind*, 123 USPQ2d at 1459 n.6.

and overall shape of each of the engine's component parts and features shown in the drawing, including the fuel tank, air cleaner cover, fan cover, and carburetor cover, not simply "the specific styling elements of each component (e.g., the complementary lines, beveling, and shapes), which together express the overall distinctive cubic look of the GX Trade Dress." 208 TTABVUE 20. *Becton, Dickinson*, 102 USPQ2d at 1374; *see also In re Bose Corp.*, 476 F.3d 1331, 81 USPQ2d 1748, 1753 (Fed. Cir. 2007) ("Bose is seeking protection of its entire pentagonal-shaped design, not only its curved front edges. If Bose were only seeking protection of its curved front edge, it would have made that clear in its application for registration."). We therefore assess the registrability of Applicant's configuration-of-an-engine mark as shown in the application drawing rather than in the alternative drawing that Applicant submitted with its brief; we also consider the description of the mark insofar as it comports with the drawing.

## VI. Opposer's Functionality Claim

### A. The Law of Functionality

Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5), prohibits registration of "a mark which … comprises any matter that, as a whole, is functional." In general terms, "'a product feature is functional,' and cannot serve as a trademark, 'if it is "essential to the use or purpose of the article or if it affects the cost or quality of the article."'" *TrafFix*, 58 USPQ2d at 1006 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1163-64 (1995)); *see also Inwood Labs, Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982); *Change Wind*, 123 USPQ2d at 1456; *Poly-America, LP v. Illinois Tool Works Inc.*, 124 USPQ2d 1508, 1513 (TTAB

2017). The functionality doctrine is intended to encourage legitimate competition by maintaining the proper balance between patent law and trademark law.

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity). That is to say, the Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity. The Lanham Act, furthermore, does not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller.

*Qualitex*, 34 USPQ2d at 1163-64.

To determine whether a product design is functional under the test reconfirmed in *TrafFix*, the Board may consider the categories of evidence set forth in *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982), discussed below. *See Valu Eng'g*, 61 USPQ2d at 1426; *Change Wind*, 123 USPQ2d at 1456 (in determining functionality under the Supreme Court's standards, "we are also guided by the analysis first applied in" *Morton-Norwich*). The *Morton-Norwich* categories are "legitimate source[s] of evidence to determine whether a feature is functional," *Valu Eng'g*, 61 USPQ2d at 1427, "aid in the determination of whether a design is de jure functional," *New England Butt Co. v. ITC*, 756 F.2d 874, 225 USPQ

260, 262 (Fed. Cir. 1985), and remain useful following the Supreme Court's decisions in *Inwood*, *Qualitex*, and *TrafFix*. *Valu Eng'g*, 61 USPQ2d at 1427; *In re Loggerhead Tools, LLC*, 119 USPQ2d 1429, 1431 (TTAB 2016).

The *Morton-Norwich* categories "are not exclusive, however, for functionality 'depends upon the totality of the evidence.'" *Heatcon*, 116 USPQ2d at 1370 (quoting *Valu Eng'g*, 61 USPQ2d at 1424); *accord Kistner*, 97 USPQ2d at 1918. "It is not required that all four factors be proven in every case, nor do all four factors have to weigh in favor of functionality to support a [finding of functionality]." *Heatcon*, 116 USPQ2d at 1370; *accord Change Wind*, 123 USPQ2d at 1456. The ultimate standard for functionality is, of course, the one established by the Supreme Court in *Inwood,* and reiterated in *Qualitex* and *TrafFix*: whether a feature is essential to the use or purpose of an article or affects the cost or quality of the article. If functionality is established under the *Inwood* standard based "upon the totality of the evidence," *Heatcon*, 116 USPQ2d at 1370, further inquiry into evidence that might be revealed by a *Morton-Norwich* analysis is unnecessary and will not change the result. *See TrafFix*, 58 USPQ2d at 1006 ("Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature.").

"In determining whether the product configuration is functional, we focus on whether the configuration *as a whole* is functional." *Kistner*, 97 USPQ2d at 1919; *see also* 15 U.S.C. § 1052(e)(5) (prohibiting registration of a mark that "comprises any matter that, *as a whole*, is functional.") (emphasis added). "The terminology 'as a

whole' in the statute does not mean that one can avoid a finding of functionality simply because the configuration includes a nonfunctional feature." *Kistner*, 97 USPQ2d at 1920. "As a whole" refers to "'the entirety of the mark itself.'" *Id*. at 1919 (quoting *Valu Eng'g*, 61 USPQ2d at 1428 n.6).

Opposer has the "initial burden of establishing a *prima facie* case of functionality." *Id*. at 1918. If Opposer establishes a prima facie case, the burden then shifts to Applicant to prove non-functionality. *Id*. (citing *Valu Eng'g*, 61 USPQ2d at 1429).

**B. The Parties' Arguments Regarding Functionality**

Opposer focuses on the overall positioning and shape of the various component elements of the claimed mark, and the resulting shape of the engine as a whole. It argues that the "compact and overall 'cubic' shape of the engine allows the engine to fit within OEM requirements and to have a lower center of gravity. The particular positions and shapes of the component parts are also functional and dictated by utilitarian and engineering requirements." 204 TTABVUE 29.

Applicant focuses on the fact that its "competitors have multiple options to visually differentiate their engines, despite using the same general engine configuration (with the air cleaner on the upper left side, the fuel tank to right of it, a carburetor cover below the air cleaner cover, and a slanted fan cover below the fuel tank)." 208 TTABVUE 17. It argues that Opposer's entire functionality argument rests on "a fundamental misstatement of the GX Trade Dress as comprising the general configuration of an inclined cylinder [OHV] engine," 208 TTABVUE 19, rather than "the specific styling elements of each component (e.g., the complementary

lines, beveling, and shapes) which together express the overall distinctive cubic look of the GX Trade Dress." 208 TTABVUE 20.

For the reasons discussed below, we agree with Opposer that it established a *prima facie* case on functionality and that Applicant did not rebut that showing.

## C. The Components and Overall Design of the GX Engine

Our analysis of the possible functionality of the applied-for mark as a whole may begin with consideration of the functionality of the separate features claimed by Applicant to compose its mark, so long as those features are considered in the context of the design as a whole. *Becton, Dickinson*, 102 USPQ2d at 1376; *In re R.M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1, 2 (Fed. Cir. 1984) (Board properly gave initial consideration to the "six features which applicant claims comprise its mark" in finding that based on the functionality of those features, the design as a whole was functional); *Change Wind*, 123 USPQ2d at 1456.

> [O]ne object of the *Morton-Norwich* inquiry is to weigh the elements of a mark against one another to develop an understanding of whether the mark as a whole is essentially functional and thus non-registrable. Whenever a proposed mark includes both functional and non-functional features, as in this case, the crucial question is the degree of utility present in the overall design of the mark … Our functionality precedent indeed mandates that the Board conduct such an assessment as part of its determination of whether a mark in its entirety is overall de jure functional.

*Becton, Dickinson*, 102 USPQ2d at 1376.

We will thus begin by considering the possible functionality of the positioning and shape of the components of Applicant's mark, including those described by Applicant as "a slanted fan cover, [a] fuel tank located above the fan cover on the right," a

"carburetor cover featur[ing] four ribs along its outside edge and a receded area where control levers are located," and [an] air cleaner located to the left of the fuel tank." These major component parts shown in the application drawing depicted below are identified as follows: A = Air cleaner cover, B = fuel tank, C = carburetor cover, and D = fan cover.



We again reproduce Applicant's description of its claimed mark below, with the designated letters shown above interspersed in the description:

> The mark consists of the configuration of an engine with an overall cubic design, with a slanted fan cover [D], the fuel tank [B] located above the fan cover [D] on the right, and the air cleaner [A] located to the left of the fuel tank [B]. The air cleaner cover [A] features a cube shape with beveled top outside edges, and a belt-like area on the lower portion of the cover encompassing the entire circumference and the top of the belt-like area is aligned with a rib of the fuel tank. The carburetor cover [C] features four ribs along its outside edge and a receded area where control levers are located. The fuel tank [B] is roughly rectangular. The engine features a beveling that runs around its top circumference.

The parties generally agree on how small utility engines like the GX Engine are designed. Citing Mr. Mieritz's testimony, Opposer summarizes the process in its main brief as follows:

> When designing this type of engine, marketing and sales groups start by determining the horsepower needed. Engineers then determine the bore and stroke and cubic inch displacement required for that horsepower range. The engine is then designed from the inside out. Engineers first create the "short block," or the power plant of the engine, then add on external components such as the fuel tank, air cleaner, fan, and carburetor. The short block includes the cylinder head, crankshaft, piston, connecting rod and cap, valve train, crank case cover, lubrication system and engine governor.[49]

This indicates that the relative positioning of the key external components, and possibly their shapes, are driven by the design of the power plant (*i.e.*, "short block"). The confidential testimony of Mr. Fujita, the only witness who testified at trial about the development of the GX Engine from direct personal knowledge, does not suggest otherwise.

### 1. The Fan Cover

The fan cover protects the fan or blower, which rotates and moves air, and is mounted to the crankshaft, which on the GX Engine is located at the center. Dr. Reisel and Mr. Mieritz agreed that the fan cover directs cooling air to the part of the engine that becomes the hottest from internal combustion,[50] which they identified as the cylinder head located behind the carburetor.[51]

---

[49] 204 TTABVUE 16 (Mieritz Tr. 12:4-13:19; 139:3-140:20). The power plant is an enclosed package that contains the elements that create the engine's power through the process of internal combustion, discussed in more detail below. Mieritz Tr. 139:20-24. The applied-for mark depicts external components of the GX Engine, or covers for external components.

[50] Mieritz Tr. 34:8-14; 211:12-23; Reisel Tr. 37:12-38:8.

[51] Reisel Tr. 38:4-8; Mieritz Tr. 146:6-14; 211:19-23.

Dr. Reisel and Mr. Mieritz also agreed that the slanted shape of the fan cover shown in the mark facilitates directing cooling air to the hottest parts of the engine.[52] Dr. Reisel testified that air is brought into the engine, accelerated in a spiral by the fan, and directed via the slanted fan cover to the cylinder head.[53] He acknowledged that the "exact specific angle [of the slant] does not need to necessarily be the same, and it may be also a function of the shape and size, especially the size of the engine as to what the exact angle will be. But it is going to - - it should be in that direction, and the shape that is taken by the trademark application is functional or the angle taken by that is functional. … It does not need to be the exact angle, but it does need to be - - it should be close to it from a performance competitive standpoint." Tr. 98:3-9, 19-21.[54]

---

[52] Mr. Hoag, Applicant's expert in the *Pep Boys* litigation, concurred that the shape of the fan cover is dictated in part by the fact that it needs to direct cooling air to the cylinder block, and that most engines direct the air in an angle upward to the left. Tr. 168:10-169:4.

[53] Tr. 37:12-38:8. He explained this process as follows: "The part that is directing the air towards the cylinder head is going to be the lower left slanted line of the fan cover, the slant that's going from the bottom right to top left. The air is brought in and is swirling around headed towards -- at the bottom of the picture it's going to be headed from right to left along the bottom, and then that slant is going to be directing it up along the cylinder to the cylinder head." Tr. 38:25-39:8.

[54] With respect to the shape of the rest of the fan cover, Dr. Reisel acknowledged that it was not necessary that the left vertical side and the top side be straight, as they are in the application drawing, Tr. 99:12-23, and that the flattened bottom side was not in the ideal shape, which he testified was rounded. Tr. 100:10-21. Against the backdrop of Applicant's claim that "the particular angle of the slant on the fan cover corresponds with the beveling on the upper right corner of the fuel tank," 208 TTABVUE 10, and is thus the key source-identifying feature of the fan cover, and the fact that the third-party fan covers in the record have a generally similar appearance to Applicant's, particularly with respect to the slant on the left side of the cover, we find that the other sides of Applicant's fan cover are not as important as the slanted left side on the issue of whether the shape of the fan cover is primarily functional.

Dr. Reisel's testimony regarding the slant of the left side of the fan cover was confirmed by the record evidence that multiple third-party engines have fan covers slanted at a similar angle (shown in green lines below).



Generac    Predator    All-Power 208 cc    Lifan (EquipSource)

Champion    Briggs 550    Kawasaki    Robin Subaru EX21

209 TTABVUE 9.[55]

Mr. Mieritz agreed with Dr. Reisel that the slant of the fan cover in the application drawing directs cooling air to the cylinder head, Tr. 36:3-7; 211:12-212:3, 8-15; 214:3-7, and that it was not necessary to use the exact same angle of the slant shown in the application drawing: "The slant can be less, can be more. It can take on different shapes and still provide cooling." Tr. 36:8-13. He opined, however, that the

---

[55] Applicant repeatedly argues that the existence of competitive engines with similarly-positioned, but differently-shaped, components shows that its mark is not functional. The existence of such engines, by itself, is not sufficient to make that showing. *Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 114 USPQ2d 1953, 1959 (Fed. Cir. 2015). The issue is whether these engines share the same utilitarian features as the GX Engine. *Becton, Dickinson*, 102 USPQ2d at 1378. *See also In re Honeywell Inc.*, 532 F.2d 180, 189 USPQ 343, 344 (CCPA 1976) (existence of multiple competing products similar in shape to applicant's product may itself support a finding of functionality). The fact that engines or components "'may be produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.'" *Bose*, 227 USPQ at 6 (quoting *Honeywell*, 189 USPQ at 344).

slanted shape of the fan cover in the application drawing was not functional, because other differently-shaped fan cover shapes were equally efficacious in terms of performance and manufacturing cost.[56] He testified about several such engines, and referred in that testimony to the following demonstrative exhibit that he had prepared for comparison purposes.



Tr. 42:1-14; Ex. 45.

We do not find this testimony to be convincing, however, because: (1) in the case of the Briggs Intek engine shown above, his testimony was based upon comparative

---

[56] Tr. 34:15-18; 36:14-45:25; Exs. 17, 21, 23, 43-45. He also testified that "the shape in Honda's fan cover - - and this is from what I read in Mr. Fujita's deposition - - is actually detrimental to the air flow. The right-hand upper corner, according to Mr. Fujita, was designed with styling, stylists, to have that look, that particular corner reduces the airflow, so Honda had to go to a larger fan to compensate for that loss." Tr. 34:22-35:5. He testified that the shape of the right-hand upper corner of the fan cover "causes turbulence within the blower housing, which can affect the air cooling." Tr. 35:11-12. Mr. Mieritz acknowledged on cross-examination that he was aware that Mr. Fujita was not involved in the styling of the GX engine, that he had never spoken with Mr. Fujita, and that he had never reviewed any documents from Applicant's styling group. Tr. 107:10-111:13. We accordingly give little weight to his opinion regarding the right-hand upper corner of the fan cover, which, as noted above, has less significance in our analysis of whether the design of the fan cover is primarily functional.

testing done by another group at Briggs & Stratton many years before, and, in any event, merely reflected his "expectation" that the Intek fan cover would provide cooling equivalent to that of Applicant's fan cover, Tr. 43:13-45:5; and (2) with respect to the equivalent performance and manufacturing costs of the other engines, his testimony was based solely on the fact that he had not seen any contrary data indicating that there were performance and cost differences between the fan covers, even though he admitted that such data existed and that he had never asked to see it or to have Applicant obtain and provide it. Tr. 45:10-25; 227:22-229:18.

In deciding whether Applicant's mark as a whole is primarily functional, we must decide whether the mark "is in its particular shape because it works better in that shape." *Becton, Dickinson*, 102 USPQ2d at 1376; *see also Change Wind*, 123 USPQ2d at 1456 (considering "the functional role of the individual features of the design … to determine whether the applied-for mark is functional and thus, unregistrable."). We find that the fan cover is in its particular slanted shape because (as both experts agreed) that slanted shape works better to direct cooling air to the hottest part of the engine than a non-slanted shape. The facts that the slant could be at a slightly different angle from the one shown in the application drawing and still perform that function (as both experts also agreed), and that third-party fan covers have slightly different slants and overall appearances (as the illustration above shows), do not detract from the fact that Applicant's slanted fan cover is slanted in the manner shown in the application drawing to serve a functional purpose. *See In re Bose Corp.*, 772 F.2d 866, 227 USPQ 1, 5-6 (Fed. Cir. 1985) ("That another type of [design] would

work equally well does not negate that this [design] was designed functionally to enhance or at least not detract from the rest of the system….”). We find that the features of the fan cover as a whole are primarily functional.

### 2. The Fuel Tank

The purpose of a fuel tank on a general purpose utility engine is to hold the fuel that is fed into the carburetor, where it mixes with air in the process of combustion. We must consider whether considerations of utility apply to the relative positioning and design of the fuel tank in the applied-for mark, which is “located above the fan cover on the right” and “is roughly rectangular” in shape, and in which “the top of the belt-like area [on the carburetor cover] is aligned with a rib of the fuel tank.”

Dr. Reisel and Mr. Mieritz agreed that the fuel tank’s location above the carburetor in Applicant’s claimed mark is dictated by utility because that location allows the use of gravity, rather than a costly and heavy fuel pump, to feed fuel into the carburetor. Reisel Tr. 40:12-3; Mieritz Tr. 21:13-17. They disagreed, however, as to whether the fuel tank had to be located on the right side of the engine, where it appears in the applied-for mark. Dr. Reisel testified that this positioning was required to keep the fuel tank away from the hottest part of the engine on the left and to maintain the compact shape of the engine given the positioning of the other accessories on the left side. Tr. 42:4-23. Mr. Mieritz testified that the fuel tank could be located in other locations, and that the particular location chosen depends upon what comes first in the overall design of the engine. Tr. 22:7-23:12. He acknowledged, however, that the positioning of the carburetor and the air cleaner on the left side of the engine in the applied-for mark required the fuel tank to be placed on the right

side. Tr. 154:20-155:4. None of the major competitive engines in the record have a fuel tank on the left. We thus find that the relative positioning of the fuel tank in the applied-for mark "above the fan cover on the right" is also dictated by utility, not design.

The experts also disagreed regarding the functionality of the "roughly rectangular shape," the beveling, and the ribbing (seam) of the fuel tank. Dr. Reisel opined that these features are dictated by function because a rectangular fuel tank provides maximum capacity within the confines of the application "envelope," and because fuel tanks are manufactured in two parts that are "mated" by the seam, which results from the process of manufacture, and a beveled tank is easier to press into its shape and remove from the production die during manufacturing. Tr. 55:13-56:57:3. Mr. Conner testified that the manufacturing process resulting in the presence of the seam on Applicant's engine was the subject of an expired patent owned by Applicant. Tr. 418:12-17, 25-420:10. Dr. Reisel had no opinion, however, on whether the particular placement of the seam on Applicant's fuel tank in a position slightly below the center of the tank was dictated by function, and he acknowledged that competitive rectangular fuel tanks could have different proportions and thus different shapes, but opined that they would all have a seam caused by the manufacturing process and "a roughly rectangular shape." Tr. 108:24-114:19.

Mr. Mieritz agreed that the rectangular shape of the fuel tank was designed to appear compact within the engine, Tr. 24:17-21, and he did not dispute that the seam that appears in the application drawing mated the two parts of the fuel tank and

resulted from the process of manufacture. He opined, however, that the positioning of the seam and the angles and features of the beveling of the tank's edges were not functional, Tr. 24:22-26:3, again pointing to third-party engines with fuel tanks having different features that he claimed performed equally well and were of equal quality. Tr. 26:4-33:8 (Exs. 17, 21, 24, and 43).[57] They are depicted below.



We agree with Mr. Mieritz that the appearance of the fuel tanks of these engines is different from that of the fuel tank in the applied-for mark, but the engines all have "roughly rectangular" fuel tanks positioned above the fan covers and to the right of or on top of the carburetors.[58] The larger sample of third-party engines reproduced

---

[57] We give little weight to Mr. Mieritz's categorical but unspecific opinion that "[t]hey all perform equally with respect to the fuel tanks," Tr. 32:13-20, because it too is unsupported by any data. Tr. 229:22-230:21.

[58] The photograph of the Vanguard engine on the lower left shows the engine from a perspective that differs from the perspectives of the other photographs. The fuel tank is not

above suggests that, like the relative positioning of the fuel tank in the applied-for mark, its "roughly rectangular" shape "is designed in a way to appear compact within the engine," and thus provides a utilitarian benefit in terms of compactness. Tr. 24:17-21.

We also agree with Mr. Mieritz that in the applied-for mark, the particular positioning of the seam on the fuel tank slightly below center, to align it with "the top of the belt-like area" on the carburetor cover, and the particular beveling and angles of the fuel tank, are not dictated by utility, but are instead ornamental features. The appearance of the fuel tank thus has both utilitarian and design elements, but we find that the fuel tank's positioning relative to the other components, and its overall "roughly rectangular" shape—which Applicant describes as its key features in the applied-for mark—to be more prominent, thus making the features of the fuel tank as a whole primarily functional.

### 3. The Carburetor Cover

The carburetor takes air that comes through the air cleaner and mixes it with fuel from the fuel tank to create a combustible mixture, and the spark-induced combustion of this mixture pushes down the piston inside of the cylinder, producing a revolution of the crankshaft and powering the engine. Mieritz Tr. 146:15-147:25. The carburetor cover is attached to the carburetor by two bolts. Mieritz Tr. 57:24-58:3. The carburetor is positioned in the applied-for mark near the intake valve on the cylinder head. This

---

visible from the front perspective of the other photographs. Tr. 30:20-24. Mr. Mieritz acknowledged that the Vanguard engine fuel tank is rectangular in shape. Tr. 30:10-14.

location is optimal because it allows for better flow of fuel into the carburetor via gravity. Mieritz Tr. 150:3-151:10. The relative positioning of the carburetor (and thus its cover) within the applied-for mark is thus dictated by engineering considerations, not decorative considerations.

Mr. Mieritz testified that the carburetor cover has three purposes: (1) it acts as a base for the air cleaner (located beneath the air cleaner cover designated with the letter A in the drawing above); (2) it includes an elbow used to connect clean air to the carburetor; and (3) it has a component on the right side that incorporates a choke lever and fuel shut-off lever that control functions of the carburetor itself. Tr. 58:8-18. He opined, however, that the specific appearance of the carburetor cover in the applied-for mark was not functional, and did not affect the performance, quality, manufacturing cost, or competitiveness of the engine, again relying on the existence of "a few" differently shaped carburetor covers, specifically three of the four third-party engines reproduced above in connection with the discussion of the shape of the fuel tank (the fourth does not use a carburetor cover). Tr. 58:19-63:14. We again agree with Mr. Mieritz that the carburetor covers in the three third-party engines have different appearances from the one in the applied-for mark, but again find unpersuasive his categorical opinions comparing the performance of these engines' carburetor covers with that of Applicant's, because they are again unsupported by data. Tr. 229:22-230:21.

In addition, Mr. Mieritz does not claim that the overall shape of the carburetor cover in the applied for mark is a result of aesthetic, rather than utilitarian,

considerations, and Applicant does not appear to make such a claim. In its description of the applied-for mark, Applicant described its carburetor cover as follows: "The carburetor cover features four ribs along its outside edge and a receded area where control levers are located." Dr. Reisel acknowledged that the four ribs on the carburetor cover are nonfunctional, Tr. 132:21-134:11, and we agree that the record shows that they are purely decorative.

With respect to the carburetor cover's "receded area where control levers are located," Dr. Reisel opined that this feature is functional for two reasons. First, he testified that the carburetor needs to be located near the fuel intake valve and the controls for the carburetor (the choke and fuel shut-off levers) need to be located near the carburetor to minimize the possibility that fuel droplets will fall out of the fuel air stream and to minimize the possibility of breakage. Second, he opined that placing the controls in the recessed area should increase their durability and reduce the likelihood of breakage, including from the action of the rewind control (disclaimed as part of the applied-for mark). Tr. 50:22-55:6.

Mr. Mieritz disagreed that the carburetor controls needed to be placed near the carburetor as long as they are easily accessible to the operator, Tr. 63:15-65:2, but he conceded that recessed controls were possibly less likely to be damaged. Tr. 215:7-15. He opined that "recessing the controls that you see in the Honda might be detrimental to users" wearing heavy gloves or mittens. Tr. 65:3-7. He again pointed to Kohler and Briggs & Stratton engines with carburetor controls located elsewhere, using a

demonstrative exhibit reproduced below, and testified about different placement of the controls. Tr. 65:8-69:1; Ex. 46.[59]



**Honda GX Controls**

**Alternative Control Locations**

Briggs INTEK

Kohler Command Pro
(New Design)

Having the choke and fuel shut-off controls located elsewhere avoids the question of why these controls appear in "the receded area where [they] are located" in the applied-for mark. We find Dr. Reisel's explanation of their location as serving a function to be more persuasive than Mr. Mieritz's rebuttal that they could be located elsewhere and that they could be difficult to use by operators wearing gloves or mittens, and we again reject Mr. Mieritz's testimony regarding comparative manufacturing costs and performance for the reasons discussed above with respect to other components.

As with the fuel tank, the appearance of the carburetor cover in the applied-for mark has both utilitarian and decorative elements. We find that the carburetor

---

[59] The red circles on the demonstrative exhibit identify the speed controls on the engines. The speed control in the applied-for mark is not located on the carburetor cover.

cover's relative positioning in the applied-for mark beneath the air cleaner cover for which it serves as a base, the presence within it of an elbow that is used to connect clean air to the carburetor, the purpose of the controls that it holds in the "receded area where [they] are located," and the reason for their placement there, make the features of the carburetor cover as a whole primarily functional, notwithstanding the presence of purely decorative ribs.

### 4. The Air Cleaner Cover

The purpose of the air cleaner is to provide clean air to enter the intake valve on the carburetor and mix with the fuel in the carburetor. It thus must be connected to the carburetor, Mieritz Tr. 152:18-20, which in the applied-for mark is positioned on the left side of the engine. The air cleaner cover protects the air cleaner.

Applicant described the features of the air cleaner cover in the applied-for mark as follows: "The air cleaner cover features a cube shape with beveled top outside edges, and a belt-like area on the lower portion of the cover encompassing the entire circumference and the top of the belt-like area is aligned with a rib of the fuel tank."

Mr. Mieritz opined that although the air cleaner cover in the applied-for mark is square ("a cube shape"), it could have been in a different shape, such as a trapezoid or a cylinder, so long as there was sufficient clearance between the cover and the cleaner to avoid air restriction. Tr. 46:11-14; 50:11-51:2. He pointed to the same third-party engines that he relied upon in his testimony about other features of the applied-for mark, Tr. 51:23-52:11, and again claimed that they performed equally well and were no more costly to manufacture than the air cleaner cover in the applied-for

mark. Tr. 51:14-57:18.[60] He also opined that while the engineers who designed the engine in the applied-for mark placed the air cleaner above the carburetor, Tr.151:24-152:4, the air cleaner cover need not have been located on the upper left of the engine because utility engines such as the GX Engines are low efficiency engines and the carburetor can be calibrated for a change in location. Tr. 48:9-25. Finally, he opined that the beveling on the air cleaner cover and the "belt-like area on the lower portion" that is aligned with the seam on the fuel tank were non-functional features. Tr. 46:18-47:8; 51:3-13.

Dr. Reisel opined that the air cleaner and its cover were located on the left in the engine in the applied-for mark to achieve what he called "volumetric efficiency," maximizing the amount of air that enters the carburetor through the intake valve. "And so in order to accomplish that, you want to put your air induction and your air intake -- your air cleaner as close as possible to the carburetor and then subsequently the intake valve as possible." Tr. 46:13-17. He opined that because the cylinder head in which the intake valve is located is on the left side of the engine (from a front perspective) in the applied-for mark, it was optimal to put the air cleaner and its cover "on that left side of the engine to reduce the passageways and, therefore, the pressure drop that the air would experience." Tr. 46:22-47:1. Mr. Hoag essentially agreed with Dr. Reisel's opinion that moving the air cleaner away from the carburetor caused an undesirable drop in air pressure, 117 TTABVUE 325, and that the air

---

[60] We do not find Mr. Mieritz's testimony persuasive for the reasons discussed above with respect to his similar testimony regarding other components.

cleaner needed to be located close to the carburetor. 117 TTABVUE 324. Dr. Reisel also opined that placing the air cleaner and its cover at the top of the engine reduced the likelihood of having debris or dust from the ground enter the engine. Tr. 47:21-48:3. On cross-examination, he expressed no view regarding the functionality of the beveling on the air cleaner cover and acknowledged that the "belt-like area on the lower portion of the cover" was not functional. Tr. 119:23-120:13. He also acknowledged differences in the appearance of the air cleaner covers referred to by Mr. Mieritz, and agreed "that for high mount air cleaner covers there are a variety of options on some of the superficial details of it, but the functionality is still dictating that it be a rectangular shape." Tr. 126:17-25.

We find that the positioning of the air cleaner cover relative to the other components of the engine is dictated by utility because of the positioning of the carburetor. At the same time, we agree with Applicant that the beveling of the air cleaner cover and the "belt-like area on the lower portion" are purely decorative features.

It is a closer question as to whether the air cleaner cover's shape is primarily a matter of utility or aesthetics. Mr. Mieritz's testimony that the cover could be in a different shape from that of the air cleaner within it suggests that the use of a cube or rectangular shape could have been a design choice, and Dr. Reisel did not directly address why a cube or rectangular shape was required by utility. Mr. Fujita, the only witness with personal knowledge of the original development of the GX Engine, testified that the air cleaner inside the cover was oval in shape and that the cover's

shape thus does not conform to the air cleaner's shape. Tr. 38:11-12. On the other hand, the "Planning Material" document makes it clear that one of the technical means for achieving Applicant's goal of designing a compact and fuel efficient engine was to use a boxlike configuration for each component, and Mr. Fujita agreed that the air cleaner cover's shape had such a conforming shape. Tr. 24:18-25; 78:1-2. We find that the choice to use a cube or rectangular shape per se was a design choice, but that the particular cube or rectangular ("boxlike") shape actually used was dictated by the utilitarian need to fit the chosen shape into the "envelope" that a compact design required.

As with the other components, the air cleaner cover includes both functional and non-functional elements. Here, however, and in contrast to our findings regarding the fan cover, fuel tank, and carburetor cover, we find that the features of the air cleaner cover as a whole are *not* primarily functional. This finding, of course, does not compel a finding that the applied-for mark, as a whole, is primarily functional. "[A] mark possessed of significant functional features should not qualify for trademark protection where insignificant elements of the design are non-functional." *Becton, Dickinson*, 102 USPQ2d at 1376.

### 5. The Claimed "Configuration of an Engine With an Overall Cubic Design"

As discussed above, Applicant's proposed mark "consists of the configuration of an engine with an overall cubic design . . .," with specific features further described. This description is consistent with the way in which the applied-for mark appears in the application drawing, and with Applicant's performance objectives in designing the

GX Engine in the early 1980s, discussed above. It is inconsistent, however, with Applicant's narrower characterization of its mark in its brief, where Applicant claims that it "does not seek protection of the basic configuration of an engine as suggested by Opposers; rather, as depicted and described in [the] application, the GX Trade Dress comprises the specific styling elements of each component (*e.g.*, the complementary lines, beveling, and shapes), which together express the overall distinctive cubic look of the GX Trade Dress." 208 TTABVUE 20.

Unsurprisingly, the parties' experts staked out opposite positions on whether the "overall cubic design" was functional. Mr. Mieritz understood this portion of the description of the mark to refer to the approximately equal height and width of the engine in the application drawing, as well as the overall visual cubic impression created by the relative position, shape, size, and orientation of each of the major components, the fuel tank, air cleaner cover, fan cover, and carburetor cover. Tr. 74:13-20; 102:22-103:20; 137:12-23. He opined that the overall cubic design has no effect on the performance, quality, manufacturing costs, or competitiveness of the engine, Tr. 74:25-75:20, and is not needed to "mate" the engine with (i.e., connect the engine to) the applications (machines) that it powers. Tr. 75:16-76:6. He also opined that it is not necessary for an engine to have the specific overall cubic design shown in the application to fit within the applications that it powers, Tr. 77:7-78:10, and that the overall cubic design does not have any impact on packaging the engine for shipping or its maintenance. Tr. 78:21-79:16. He pointed once again to third-party engines with alternative designs, Tr. 81:19-83:3, and opined that their differing

overall appearances have no effect on quality, performance, or cost metrics. Tr. 83:4-94:23 (Exs. 17, 21, 23-24, 43-44).

On cross-examination, Mr. Mieritz acknowledged that an engineering goal in designing a general purpose utility engine is to design a small engine, "as small a package as it can," in part to fit within OEM applications. Tr. 105:8-19; 106:3-7.[61] He also acknowledged that one of the original objectives in designing the GX Engine was to reduce packaging and shipping costs, Tr. 118:15-119:20, that the overall cubic design of the engine in the applied-for mark allowed it to be compact, Tr. 136:23-137:11, and that the shape, size, and relative positioning of the four referenced key components of the GX Engine rendered it compact, adaptable to a wide variety of applications, and, with respect to at least some components, easy to maintain. Tr. 138:1-13; 157:2-14; 156:15-157:1.

Dr. Reisel opined, on the basis of a review of Mr. Fujita's and Mr. Conner's testimony,[62] Applicant's website regarding its performance objectives in the design of the GX Engine, and discussions with Kohler and Briggs & Stratton engineers, that

---

[61] Mr. Hoag agreed with Mr. Mieritz on this point. Tr. 217:26-218:10; 335:20-22.

[62] Mr. Fujita testified in general terms that the development of a compact engine capable of being mounted on OEM applications and having the other desired performance attributes required the development and use of boxlike external components. Tr. 24:22-25:21. He also testified in general terms that the overall square shape of the GX Engine, and the box-like appearance of its components, enabled it to achieve Opposer's performance objectives of improved fuel economy, reduced vibration, a more compact size, a lower center of gravity, and easier maintenance. Tr. 56:9-24; 57:12-58:20; 59:4-21; 60:13-61:13; 67:14-70:2. Mr. Conner testified in general terms that the overall cubic design described in the application referred to the ability to fit all of the engine components into an imaginary box around the engine, that each individual component contributed to the overall design of the engine, and that the cubic shape minimizes the size of the application envelopes into which the engine can fit, a generally desirable performance attribute. Tr. 185:17-186:1; 188:3-16; 191:7-14; 192:25-193:1, 19-196:4; 197:17-200:9.

the overall cubic design of the applied-for mark is necessary from a performance and cost-competiveness standpoint. Tr. 29:13-24. He opined that the OEM application market requires an engine that is compact in design and size, and that the best way to achieve a compact design and size is an overall cubic design resulting from flat surfaces that are easily mated to other devices in applications. Tr. 29:24-30:9. He also opined that an overall cubic design reduces manufacturing and shipping costs, Tr. 31:17-32:14, and makes maintenance easier. Tr. 32:15-33:5. With respect to the third-party engines discussed by Mr. Mieritz, Dr. Reisel opined that "each contained approximately the same general configuration and that the relative components of the engines were the same and that they took on an overall cubic nature. They were generally box-like in appearance." Tr. 36:1-12.

Applicant's sole attack on Dr. Reisel's opinions regarding the functionality of the overall cubic design in the applied-for mark is that he "admitted that many of its complementary lines and angles are purely ornamental, including: (1) the similar beveling on the air cleaner cover and fuel tank ([Tr.] 138:11-15); (2) the similar angles on the top right of the fuel tank and lower left of the fan cover ([Tr.] 141:14-142:2); and (3) the straight line created by the lower left side of the fan cover lining up with the carburetor cover. [Tr.] 142:3-143:1." 208 TTABVUE 22.

As Mr. Mieritz acknowledged, the "components that contribute to the overall cubic design of the Honda engine are the fuel tank, the air cleaner cover, the fan housing, and the carburetor cover." Tr. 74:17-20. The "cubic" whole of the applied-for mark is thus admittedly the sum of its "cubic" individual parts. We have found above that the

relative positioning and the particular shapes of all but one of these components are dictated by utility. The testimony of both experts, as well as that of Mr. Fujita and Mr. Conner, shows that the combination of the components into the claimed "overall cubic design" of the applied-for mark has the utilitarian benefits that Applicant set out to realize when it first designed the GX Engine with its boxlike external components, including compactness and adaptability to a range of OEM applications. The record shows that other engines in different "cubic" shapes could also achieve those benefits, but that "does not negate that that this [overall cubic shape] was designed *functionally…*" *Bose*, 227 USPQ at 5-6. We find that the "overall cubic design" of the applied-for mark "is in its particular shape because it works better in that shape" than in other shapes, and is primarily functional. *Becton, Dickinson*, 102 USPQ2d at 1376.

### 6. The Applied-For Mark in Its Entirety

"Whenever a proposed mark includes both functional and non-functional features, as in this case, the critical question is the degree of utility present in the overall design of the mark." *Id*. In order to complete our analysis, we must address the impact, if any, of the "specific styling elements" of each component (e.g., the complementary lines, beveling, and shapes) and the other purely decorative features that Applicant argues express its claimed trade dress. 208 TTABVUE 20.

Many of these specific features no longer appear the same way (or at all) in the proposed mark following the GX Engine redesign.[63] These changes are significant

---

[63] The air cleaner cover continues to "feature[] a cube shape," but the "beveled top outside edges, and [the] belt-like area on the lower portion of the cover encompassing the entire

because Applicant argued in opposition to Opposer's abandonment claim that the modified mark is the legal equivalent of the mark in the application drawing and "maintains the same commercial impression as its predecessor." 208 TTABVUE 55. This essentially means that the claimed source-identifying essence of the applied-for mark inheres in the "overall cubic design, with a slanted fan cover, the fuel tank located above the fan cover on the right, and the air cleaner located to the left of the fuel tank," not in the "specific styling elements" and the other purely decorative features. If, as Applicant contends, the modified mark is the legal equivalent of the applied-for mark despite these changes to (or the outright removal of) key decorative elements of the applied-for mark, it follows that those decorative elements are relatively insignificant to the applied-for mark as a whole or, more specifically, to its overall commercial impression.

Another review of Applicant's description of the applied-for mark is useful to illustrate this point.

> The mark consists of the configuration of an engine with an overall cubic design, with a slanted fan cover, the fuel tank located above the fan cover on the right, and the air cleaner located to the left of the fuel tank. The air cleaner cover features a cube shape with beveled top outside edges, and a belt-like area on the lower portion of the cover encompassing the entire circumference and the top of the belt-like area is aligned with a rib of the fuel tank. The carburetor cover features four ribs along its outside edge

---

circumference" were changed. The "belt-like area" is no longer a "belt" but was changed to embody a "skirt." Mieritz Tr. 95:24-25; 186:1-5. The beveling on the "beveled top area" on the air cleaner cover was softened. Tr. 95:21-23; 186:6-8. The "four ribs along [the] outside edge" of the carburetor cover were removed. Tr. 95:23-24. The engine still "features a beveling that runs around its top circumference," but the beveling on the fuel tank was rounded and softened, and the claimed complementary angles in the application drawing no longer appear to be complementary.

> and a receded area where control levers are located. The fuel tank is roughly rectangular. The engine features a beveling that runs around its top circumference.

We have found the features described in the first sentence to be dictated primarily by utility. The remainder of the description discusses specific component features. We have found the receded area on the carburetor cover and the "roughly rectangular" shape of the fuel tank to be dictated by utility. The described features of the air cleaner cover and the "beveling that runs around" the engine's top circumference were changed, and the ribs on the carburetor cover were eliminated, but Applicant contends that the resulting mark is still the applied-for mark. We agree—because these features are incidental to the overall design, and not what creates the commercial impression of the applied-for mark. Accordingly, we find that these "specific styling elements" of each component and the other purely decorative features such as the four ribs on the carburetor cover and the "belt-like area" on the air cleaner cover, are relatively insignificant in the context of the applied-for mark as a whole.

For the reasons discussed above, we further find that the applied-for mark as a whole is primarily functional because the totality of the record shows that the functional features of Applicant's "configuration of an engine with an overall cubic design, with a slanted fan cover, the fuel tank located above the fan cover on the right, and the air cleaner located to the left of the fuel tank" outweigh the "complementary lines and beveling" and the other decorative and non-functional aspects. *Becton, Dickinson*, 102 USPQ2d at 1376-78; *Bose*, 81 USPQ2d at 1753. The overall appearance of the applied-for mark is essential to the use or purpose of the engine

and affects its quality under the *Inwood* test. The applied-for mark as a whole "is in its particular shape because it works better in that shape," *Becton, Dickinson*, 102 USPQ2d at 1376, as it enables efficient engine operation and furthers Applicant's stated objectives of compactness and adaptability to a range of OEM applications. "The record shows the arrangement of significant functional features is directed by utilitarian concerns to make operation of the device easier, safer and more efficient." *Heatcon*, 116 USPQ2d at 1378.

Because we have found the applied-for mark to be functional under *Inwood, TrafFix*, and their progeny without reliance upon the specific types of evidence discussed in *Morton-Norwich*,[64] and because "there is no requirement that all of the categories of evidence identified in *Morton-Norwich* appear in every case in order to" find functionality, *Change Wind*, 123 USPQ2d at 1456; *see also Heatcon*, 116 USPQ2d at 1370; *TrafFix*, 58 USPQ2d at 1006, we will only briefly address the trial evidence in these categories for the sake of completeness.

---

[64] The parties discussed the *Morton-Norwich* categories of evidence, and their experts and lay witnesses addressed them in their testimony, but we have not found them to be necessary to establish the functionality of the applied-for mark.

### D. The *Morton-Norwich* Categories of Evidence[65]

1. **The Existence of a Utility Patent Disclosing the Utilitarian Advantages of the Design[66]**

a. **United States Utility Patents**

In *TrafFix*, the Supreme Court held that the existence of a utility patent for features for which trademark protection is sought is often critical to a determination that the features are functional. 58 USPQ2d at 1005. At the same time, the absence of a United States utility patent that claims or discusses the functional benefits of an applied-for mark does not establish that the applied-for mark is *not* primarily functional. *In re Gibson Guitar Corp.*, 61 USPQ2d 1948, 1950 n.3 (TTAB 2002) (the absence of a pertinent utility patent "simply has no weight in our analysis."); *see also Dippin' Dots, Inc. v. Frosty Bites Distrib. LLC*, 369 F.3d 1197, 70 USPQ2d 1707, 1713 (11th Cir. 2004) ("The Supreme Court held in *TrafFix* that a 'utility patent is strong evidence that the features therein claimed are functional.' It did not, however, conclude the inverse, *i.e.*, that the absence of such features in the patent is strong evidence that the features are not functional.") (citation omitted); *In re Deister Concentrator Co.*, 289 F.2d 496, 129 USPQ 314, 319 (CCPA 1961) (with respect to patents made of record by applicant "to provide grounds for an argument that the structures shown in the patents did *not* have the outline shape it desires to register,"

---

[65] We summarize our conclusions regarding these categories of evidence in the body of our opinion. A more complete description of various materials pertaining to these categories of evidence is set forth in the attached Appendix.

[66] This *Morton-Norwich* category focuses on utility patents, but we will also consider the Japanese model applications, which are in the nature of a United States patent application, and the design patents in the record.

court saw "no reason to consider appellant's patents except to the extent they may contain evidence of the functionality of the outline shape sought to be registered as a trademark.")

Opposer made of record seven United States utility patents, 127 TTABVUE 7-97, but in its brief discusses only one of them, expired U.S. Patent No. 4,813,385 (the "'385 Patent"). We have reviewed the other six utility patents and find that they are not probative of functionality, so we will confine our analysis to the '385 Patent.

Opposer focuses on Figure 1 of the '385 Patent, arguing that this drawing is "substantially similar to the applied-for mark." 208 TTABVUE 34. Applicant argues that "the '385 patent neither describes nor ascribes any benefit to the specific styling components depicted in Figure 1, and thus does not support a finding that the applied-for mark is functional." 208 TTABVUE 25.

The '385 Patent shows various views of the GX Engine, and mentions the relative location and shape of the engine's fuel tank and air cleaner, including in the claims, but it does not ascribe any functional benefits to those features. The patent claims are directed to the external structure and internal workings of the air cleaner and the precleaner themselves, which are internal components that are not part of the applied-for mark. Opposer does not appear to argue that the external structure and internal workings of the air cleaner and the precleaner in the '385 Patent necessarily dictates the appearance of any of the claimed elements of Applicant's design. We thus find that the '385 Patent is not probative of functionality.

### b. Japanese Utility Model Applications

Opposer made of record 14 Japanese utility model applications, but discusses only three of them in its brief. 204 TTABVUE 20-23. Although we have considered all evidence properly of record, we confine our analysis to these three applications.

Utility model application No. S63-32344 (the "'344 Application") is entitled "General Purpose Internal Combustion Engine." 104 TTABVUE 41-44. Unlike the '385 Patent, which focused on specific components of the engine, the subject of the '344 Application is the overall inclined-cylinder engine itself. It claims, *inter alia*, the relative positioning of the fuel tank, carburetor, and the air cleaner as they appear in the trademark application drawing, and attributes certain benefits to the overall shape of the engine, including compactness, light weight, adaptability to "a wide variety of applications," and ease of maintenance, which were among Applicant's original performance objectives in designing the GX Engine. Mr. Mieritz acknowledged that the '344 Application "describes an engine that has similar characteristics to the Honda GX engine," Tr. 159:19-22, and that the engine claimed in the '344 Application looks similar to the applied-for mark. Tr. 161:9-16. He also agreed that the engine claimed in the '344 Application achieved the performance objectives identified in the Detailed Description of the Innovation. Tr. 172:14-175:18. We find that the '344 Application is probative of functionality and corroborates our finding, based upon the other evidence discussed above, that Applicant's "configuration of an engine with an overall cubic design, with a slanted fan cover, the

fuel tank located above the fan cover on the right, and the air cleaner located to the left of the fuel tank," is primarily functional.

Utility model No. S62-33961 (the "'961 Application") is entitled "General-Purpose Engine." 104 TTABVUE 24-26. The '961 Application shows a version of the engine depicted in the drawing of the applied-for mark, and discusses, in general terms, the relative positioning of the components, but it does not attribute the performance benefit of having the controls in the same plane to that positioning, or to the recessed area of the carburetor cover. We find that the '961 Application is not probative of functionality.

Utility model No. 63-35160 (the "'160 Application") is entitled "Cooling Device for Internal Combustion Engine." Although the specific focus of '160 Application is a cooling device, the '160 Application suggests that the flat bottom of the fan cover, while not optimally-shaped, as Dr. Reisel acknowledged, Tr. 100:10-21, is dictated by the presence of an inclined cylinder. This is probative of functionality, and also corroborates our finding, based upon the other evidence discussed above, that the shape of the fan cover is primarily functional.

### c. United States Design Patents

"[W]hile evidence of a design patent may be some evidence of non-functionality under *Morton-Norwich*, 'the fact that a device is or was the subject of a design patent does not, without more, bestow upon said device the aura of distinctiveness or recognition as a trademark.'" *Becton, Dickinson*, 102 USPQ2d at 1377 (quoting *R.M.*

*Smith,* 222 USPQ at 3 (internal quotation omitted)). As the Federal Circuit has explained,

> Our law recognizes that the existence of a design patent for the very design for which trademark protection is sought 'presumptively . . . indicates that the design is not *de jure* functional.' Absent identity between the design patent and proposed mark, the presumption loses force, and the 'similar' design patents lack sufficient evidentiary value to overcome the strong conclusion in this case that [applicant's] utility patents underscore the functionality of significant elements of the proposed mark.

*Loggerhead Tools,* 119 USPQ2d at 1432 (quoting *Becton, Dickinson,* 102 USPQ2d at 1377) (internal quotation omitted).

Applicant owned expired United States Patent No. D282,071 (the "'071 Patent"), which claimed the "ornamental design for an internal combustion engine, as shown." 164 TTABVUE 252-256. Applicant argues that its "expired design patent on the GX is *presumptive evidence of non-functionality.*" 208 TTABVUE 26. We disagree. Applicant argues that its design patent "depicts nearly all the features of the GX Trade Dress," 208 TTABVUE 26, but it also covers multiple features of the three-dimensional GX Engine that do not appear in the drawing of the applied-for mark, and by Applicant's admission it is not identical to the applied-for mark. Given the presence of many other elements in the design patent, it is not persuasive evidence of non-functionality.[67]

---

[67] Applicant also made of record engine design patents owned by Kohler and Briggs & Stratton, 164 TTABVUE 233-251, arguing that all of the design patents in the record "confirm that, notwithstanding the *de facto* functionality of a general purpose engine, such as the GX, the specific styling of such an engine is ornamental and not dictated by function." 208 TTABVUE 26. Whatever they may show, the other design patents do not show that the design in the applied-for mark is not primarily functional.

## 2. Advertising Touting the Utilitarian Advantages of the Design

"If a seller advertises the utilitarian advantages of a particular feature of its product, this constitutes strong evidence of functionality." *Kistner*, 97 USPQ2d at 1924. Opposer argues that "the record reflects that [Applicant] routinely touts the functional features of its GX engine in its advertising, such as reliability, durability, superior fuel efficiency, low emission levels, performance, value and, most notably, compactness." 204 TTABVUE 35-36. Applicant responds that "[w]hile it is certainly true that Honda's advertising discusses the functional benefits of the GX, nowhere does that advertising ascribe any of those benefits to the specific 'cubic' look comprising the GX Trade Dress." 208 TTABVUE 30.

We reproduce in the Appendix a number of Applicant's advertisements, including two that the parties discuss under this *Morton-Norwich* category of evidence. Applicant's advertisements tout performance attributes of the GX Engine such as power and fuel efficiency, but do not ascribe them to the design of the applied-for mark. They are not probative of functionality.[68] *See Change Wind*, 123 USPQ2d at 1462 (applicant's advertising was "inconclusive on the issue of functionality" even though it touted some of the same benefits discussed in applicant's utility patent,

---

[68] Applicant cites *Global Manufacture Grp. v. Gadget Universe.com*, 417 F. Supp.2d 1161 (S.D. Cal. 2006) for the proposition that "[b]ecause [Applicant's] advertisements do not attribute any functional benefit to the GX Trade Dress, they support a finding that the GX Trade Dress is nonfunctional." 208 TTABVUE 30. *Global Manufacture* held, in the context of a motion for summary judgment on the issue of the functionality of a mobile scooter design, that the absence of advertising touting the utilitarian features of the design assisted the plaintiff in establishing a genuine dispute of material fact under Ninth Circuit law. *Id.* at 1169. For the reasons discussed above in connection with the utility patents, the absence of advertising touting the functional benefits of the applied-for mark does not show that the mark is non-functional.

because it did not "*explicitly* tie the touted benefits to the various aspects of the [wind] turbine depicted in the drawing in this application.")

### 3. Competitive Alternatives

Applicant argues that there are "numerous other alternative designs available in the market, which like the GX, are compact and offer the same performance benefits yet are nonetheless visually distinct." 208 TTABVUE 27. As discussed above, Applicant did not show through persuasive testimony that the other engines in the record "offer the same performance benefits" as the applied-for mark, but the record shows other engines that are compact and have components whose features differ somewhat in appearance from the counterpart features in the applied-for mark. Their existence does not aid Applicant, however, because as the Supreme Court explained in *TrafFix*, "once a product feature is found functional based on other considerations there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available." *Valu Eng'g*, 61 USPQ2d at 1427. "The availability of alternative designs does not convert a functional design into a non-functional design." *Kistner*, 97 USPQ2d at 1928 (citing *TrafFix*, 58 USPQ2d at 1007). Indeed, "[i]t is probative of functionality that others in the industry use similar designs; they do not have to be identical." *Change Wind*, 123 USPQ2d at 1465 (citing *Becton, Dickinson*, 102 USPQ2d at 1378).

### 4. Simple and/or Inexpensive Methods of Manufacture

Dr. Reisel testified regarding whether the design of the applied-for mark affected the cost of materials and engine manufacture.[69] We find that his testimony did not establish that the applied-for mark resulted from a simple or inexpensive method of manufacture. Like Mr. Mieritz, he acknowledged that he was unaware of specific data regarding the manufacturing costs of the GX Engine or comparative manufacturing costs.[70] Unlike Mr. Mieritz, however, he has never worked for an engine manufacturer or personally designed an engine or engine component, and he has had limited academic training and experience in manufacturing and cost analysis per se.[71] While these gaps in his background do not detract materially from the weight we accord his overall testimony regarding the functionality of the component parts of the engine in the applied-for mark, or its overall configuration, they do render unpersuasive his testimony on this specific *Morton-Norwich* category of evidence.

At the same time, however, we reject Mr. Mieritz's testimony regarding the manufacturing costs of the engine shown in the applied-for mark on the ground that it is conclusory and unsupported by available data.[72] Mr. Fujita's testimony that the design of the GX Engine actually increased its cost to manufacture is equally vague— which is all the more puzzling given that he was a member of the large performance

---

[69] Tr. 50:14-21; 52:3-21; 54:12-20; 60:12-61:15; 178:17-19.

[70] Tr. 80:11-21; 83:6-21; 85:6-11; 86:20-24; 88:15-20; 94:20-24; 95:20-24.

[71] Tr. 64:17-66:15; 69:21-25; 72:9-10, 20-73:12; 97:18-20; 105:7-9; 116:9-11; 127:22-24.

[72] Tr. 32:3-8, 22-33:12 (fuel tank); 38:3-20; 39:23-25 (air cleaner cover); 41:8-13 (carburetor cover); 46:22-47:17 (fan cover).

design group on the GX Engine project and might reasonably be expected to have specific information on this point. In any event, "'while evidence that a product feature makes the product cheaper to manufacture may be probative in showing functionality, evidence that it does not affect its cost is not necessarily proof of non-functionality.'" *Kistner*, 97 USPQ2d at 1930 (quoting *In re N.V. Organon*, 79 USPQ2d 1639, 1646 (TTAB 2006)). Even if the GX Engine were no less expensive to manufacture than other engines, "while a lower manufacturing cost may be indicative of the functionality of a product's features, an equal or higher cost does not detract from the functionality of those features." *Id.* We find that this *Morton-Norwich* evidence is not probative of functionality.

Finally, we point out that because we have found that the design has *use*-related benefits, there is no need to determine whether the design also has *cost*-related benefits. The Supreme Court has stated that "a product feature is functional, and cannot serve as a trademark, [1] if it is essential to the use or purpose of the article *or* [2] if it affects [a] the cost *or* [b] quality of the article." *TrafFix*, 58 USPQ2d at 1006 (citation omitted; emphasis and numbering added). Thus, a product feature can be found functional for being essential to the product's use or purpose, or affecting its quality, *or* affecting its cost. Here, we have already found that the design does indeed have use-related utilitarian benefits. In other words, even if a hypothetical product were substantially more expensive to manufacture, functionality doctrine would permit others to try to compete in the submarket for such a more expensive but better-working product. Ultimately, consumers would stand to benefit from not only

the price-reducing economic effects competition, but also from any cost-reducing innovations that resulted from such competition. For these reasons, we find that this *Morton-Norwich* evidence is not probative of functionality.

\* \* \*

We find, in sum, that the applied-for mark as a whole is functional. While that finding alone is a sufficient basis upon which to sustain this opposition, we also consider Opposer's second primary ground for opposition: that the applied-for mark has not acquired distinctiveness.

## VII. Opposer's Claim of Lack of Acquired Distinctiveness

"Product design almost invariably serves purposes other than source identification, and consumers are aware that even the most unusual product design is intended not to identify the source of the goods, but to render the product itself more useful or appealing." *AS Holdings,* 107 USPQ2d at 1837 (citing *Wal-Mart*, 54 USPQ2d at 1069). As a result, "product designs can never be inherently distinctive and will always require evidence of acquired distinctiveness or secondary meaning" to be registrable as marks. *Id*. (citing *Wal-Mart*, 54 USPQ2d at 1070). Acquired distinctiveness means that consumers have come to associate the mark with a single (even if anonymous) source. *See, e.g., Inwood*, 214 USPQ at 4 n.11; *Coca-Cola Co. v. Koke Co. of Am.*, 254 U.S. 143, 146 (1920); *Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 31 USPQ2d 1321, 1329 & n.11 (Fed. Cir. 1994); *Textron, Inc. v. U.S. Int'l Trade Comm'n*, 753 F.2d 1019, 224 USPQ 625, 627 (Fed. Cir. 1985).

Applicant provided sufficient Section 2(f) evidence of acquired distinctiveness during prosecution to persuade the Examining Attorney to approve the application

for publication for opposition. *See Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1004 (Fed. Cir. 1988) ("[T]here is a presumption that the examining attorney found that the applicant had made a prima facie case of acquired distinctiveness.").[73] "[W]hen the same mark is challenged in an *inter partes* proceeding such as this opposition, it is the opposer that has the initial burden to establish prima facie that the applicant did not satisfy the acquired distinctiveness requirement of Section 2(f)." *AS Holdings*, 107 USPQ2d at 1837. "The opposer may meet this initial burden if it produces 'sufficient evidence or argument whereby, on the entire record then before the board, the board could conclude that the applicant has not met its ultimate burden of showing acquired distinctiveness.'" *Id.* (quoting *Yamaha*, 6 USPQ2d at 1005).

> If the opposer does present its prima facie case challenging the sufficiency of applicant's proof of acquired distinctiveness, the applicant may then find it necessary to present additional evidence and argument to rebut or overcome the opposer's showing and to establish that the mark has acquired distinctiveness. … In Section 2(f) proceedings, as in any other oppositions, once the opposer establishes its prima facie case, all evidence must be considered. … [T]he standard of proof in an opposition under section 2(f) has always been a preponderance of the evidence, although logically that standard becomes more difficult to meet as the mark's descriptiveness increases.

*Yamaha*, 6 USPQ2d at 1005-06, 1008.

---

[73] For purposes of this opposition, "the Board is not bound by the Examining Attorney's decision to allow publication of the mark." *Apollo Med. Extrusion Techs., Inc. v. Med. Extrusion Techs., Inc.*, 123 USPQ2d 1844, 1852 (TTAB 2017) (citing *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1265 (Fed. Cir. 2015)).

As the Board put it in *In re Udor U.S.A. Inc.*, 89 USPQ2d 1978, 1986 (TTAB 2009), "the lesser the degree of inherent distinctiveness, the heavier the burden to prove that it has acquired distinctiveness." Here, two circumstances loom large. First, we are dealing with product configuration. "While there is no fixed rule for the amount of proof necessary to demonstrate acquired distinctiveness, the burden is heavier in this case because it involves product configuration[]." *In re Ennco Display Sys., Inc.*, 56 USPQ2d 1279, 1283-84 (TTAB 2008). Second, where, as here, many third parties are using similarly-shaped engine configurations, "a registration may not issue except upon a substantial showing of acquired distinctiveness." *Udor*, 89 USPQ2d at 1986; *see also House of Worsted-Tex, Inc. v. Superba Cravats, Inc.*, 284 F.2d 528, 128 USPQ 119, 121 (CCPA 1960) (where an alleged mark refers to several entities, "[i]t would require much to develop a secondary meaning whereby the public would come to associate [the mark] with a single manufacturer or vendor"); *cf. Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939, 940-41 (Fed. Cir. 1984) ("When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances.").

## A. Opposer's Prima Facie Case

Opposer's prima facie case of lack of acquired distinctiveness consists of surveys, what it calls "dozens of examples of third party engines with substantially similar

shapes and configurations to the applied-for mark being sold in the U.S.," 204 TTABVUE 40, and attacks on Applicant's evidence.

As discussed above in connection with functionality, the record contains multiple examples of similarly-shaped third-party engines with components having the same general configuration of, and being located in the same places as, the primary components of the GX Engine. We reproduce below depictions[74] of some of the engines:[75]



Honda GX     Generac     Predator

Robin Subaru EX21     All-Power 208 cc     Lifan (EquipSource)

Champion     Blue Max 24     Briggs 550

---

[74] Photographs of various third-party engines were improperly designated as Confidential. 164 TTABVUE 36, 221; 188 TTABVUE 77-94. Engines are obviously exposed to the public.

[75] Some additional relevant third-party engines are shown at 118 TTABVUE and 130 TTABVUE.

Applicant argues that Opposer admits, and that various witnesses testified, that there are differences in appearance between these engines and the GX, and that there have been no reported instances of confusion as to their source. 208 TTABVUE 34. We agree that there are differences, but "[i]n order to be relevant to the question of whether applicant's mark has acquired distinctiveness, the third-party uses do not have to be identical to applicant's mark." *Saint-Gobain Corp. v. 3M Co.*, 90 USPQ2d 1425, 1440 (TTAB 2007) (color mark); *see also Goodyear Tire & Rubber Co. v. Interco Tire Corp.*, 49 USPQ2d 1705, 1720 (TTAB 1998) (differences between applicant's tire tread designs and third-party designs not shown by applicant to be of source-identifying significance). The third-party engines mirror Applicant's description of its claimed mark: "an overall cubic design, with a slanted fan cover, the fuel tank located above the fan cover on the right, and the air cleaner located to the left of the fuel tank," with a roughly rectangular fuel tank.

When considered in conjunction with Opposer's other evidence of non-distinctiveness, and its arguments regarding the deficiencies in Applicant's Section 2(f) showing, we find the third-party uses sufficiently similar to Applicant's claimed mark, as shown and described in the application, to establish a prima facie case that Applicant's claimed mark does not serve as a unique identifier of the source of the goods. Accordingly, Applicant must show, on the basis of the record as a whole, that its claimed mark has acquired distinctiveness.

### B. Applicant's Evidence of Acquired Distinctiveness

"Acquired distinctiveness may be shown by direct and/or circumstantial evidence. Direct evidence includes actual testimony, declarations or surveys of consumers as to their state of mind. Circumstantial evidence is evidence from which consumer association may be inferred, such as years of use, extensive amount of sales and advertising, and any similar evidence showing wide exposure of the mark to consumers." *Stuart Spector Designs Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549, 1554 (TTAB 2009); *see also In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 422 (Fed. Cir. 1985) ("An evidentiary showing of secondary meaning, adequate to show that a mark has acquired distinctiveness indicating the origin of the goods, includes evidence of the trademark owner's method of using the mark, supplemented by evidence of the effectiveness of such use to cause the purchasing public to identify the mark with the source of the product."). No single factor is determinative. *Id.* In cases of product configuration, the evidence provided to establish acquired distinctiveness must relate to the promotion and recognition of the specific configuration embodied in the applied-for mark and not to the goods in general. *See Inwood*, 214 USPQ at 4 n.11 ("To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."); *see also Ennco Display*, 56 USPQ2d at 1285 ("advertising that touts a product feature for its desirable qualities and not primarily as a way to distinguish

the producer's brand is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding") *(citation omitted)*.

1.     **Direct Evidence**

**a. Testimony**

In a section of its brief entitled "Established Place in the Market," Applicant discusses the testimony of Messrs. Mieritz, Conner, Rumao, and Hotz, and the distributors who submitted form declarations during prosecution, to show acquired distinctiveness. 208 TTABVUE 38. As discussed much earlier, in our review of evidentiary objections, we have excluded the testimony of Mr. Mieritz on the perceptions of OEMs, dealers, and distributors "that the look of the GX was known throughout the industry." 208 TTABVUE 38. Opposer did not object at trial to the portions of Mr. Mieritz's testimony that the GX Engine was viewed as the number-one engine in the industry with respect to performance and durability, Tr. 97:9-19, and we have considered that testimony on the issue of acquired distinctiveness. He testified, however, that the "[a]ppearance [of the GX Engine] had nothing to do with that," Tr. 98:20-25, and that he had no opinion regarding whether "OEM's, distributors, dealers, or other potential customers would immediately recognize the look of the GX engine and associate it with Honda." Tr. 220:17-24. We find that this testimony does not establish that the applied-for mark has acquired distinctiveness.

The testimony of the three other witnesses, Conner (American Honda's Assistant Vice President), Rumao (a Kohler employee), and Hotz (a Briggs & Stratton employee), generally establishes that the GX Engine is the market leader in this

category of engines and enjoys a good reputation. These facts, like the sales and advertising figures discussed below, do not by themselves establish that the applied-for mark has acquired distinctiveness because they are not "probative of purchaser recognition of a configuration as an indication of source." *Stuart Spector Designs*, 94 USPQ2d at 1572 (evidence of substantial sales and market share over the years insufficient to show recognition of guitar design).

The Distributor Statements were substantively identical, differing only in the name of, and (in some instances) the contact information for, each declarant and his company, and the specifics regarding the periods during which each had been in business and had distributed the GX Engine. A drawing of the mark in the application and a color photograph of the GX Engine were attached to each statement. One of the Distributor Statements is reproduced below:

**DISTRIBUTOR STATEMENT**

The undersigned states that he is an employee of ___*Iowa Power Products*___ [Company Name & Address], which distributes gasoline engines for construction and/or power equipment. I have worked in the business of the distribution of gasoline engines for construction and/or power equipment for _20_ years. In the course of my work, I have become familiar with many construction, maintenance and/or power equipment products, including engines used in construction, maintenance and/or power equipment.

Engines having the appearance and shape shown in the attached drawing and photograph are known to me as being sold by Honda. For _17_ years, my company has distributed engines of Honda having the appearance and shape shown in the attached drawing and photograph.

It is my understanding that the engine appearance and shape shown in the attached drawing and photograph is well known and famous in the construction and power equipment industry as being the engine appearance and shape of engines sold by Honda. My company distributes these products because they are of a superior quality and are recognized by our customers as a superior quality engine produced by Honda.

Date: _5/30/07_

Signature: _Thomas Campbell_
Name: _Thomas Campbell_
Title: _Service Technician/Warranty_

US1DOCS 6170508v3

"Form statements may be used to show acquired distinctiveness," *In re Florists' Transworld Delivery Inc.*, 106 USPQ2d 1784, 1794 n.9 (TTAB 2013), but the ones here suffer from multiple deficiencies that vitiate their probative value on the issue of acquired distinctiveness.

First, "they are all essentially identical in form and were clearly not composed individually. … [S]uch statements are less persuasive than statements expressed in the declarants' own words." *In re Pohl-Boskamp GmbH & Co.*, 106 USPQ2d 1042, 1051 (TTAB 2013).

Second, the declarations refer to, and are expressly based upon, both the application drawing showing the applied-for mark *and* a color photograph of the GX Engine that shows a red, white, and black color scheme and the HONDA house mark,[76] matters that are not part of the applied-for mark. We cannot determine the extent to which the declarants' professed state of mind about "the engine appearance and shape shown in the attached drawing and photograph" is based solely upon the claimed features of the applied-for mark, as opposed to the engine's color scheme, the HONDA brand name, or any other visible features of the engine that are not part of the applied-for mark. Because the declarations do not account for features of the GX Engine that appear in the photograph but not in the applied-for mark, they are not probative of the distinctiveness of the applied-for mark. *See, e.g., Petersen Mfg. Co. v.*

---

[76] The black-and-white copy of the photograph attached to each declaration in the record has very poor resolution due to facsimile transmission of the declaration from each declarant, but Applicant submitted a clean color copy of the photograph in its June 11, 2007 Response to Office Action in which the color scheme and the HONDA word mark are clearly visible. We assume, on the basis of this submission, that each declarant saw a clean color copy of the photographs before he signed his declaration.

*Central Purchasing, Inc.*, 740 F.2d 1541, 222 USPQ 562, 569 (Fed. Cir. 1984) ("The affidavits of Petersen are devoid of facts from which a conclusion of secondary meaning could be drawn. No evidence came from consumers that they rely on shape alone, rather than on the prominently displayed word mark VISE-GRIP, to identify the source of the product."); *In re Kotzin*, 276 F.2d 411, 125 USPQ 347, 350 (CCPA 1960) (affidavit averring that customers recognized the *placement* of a label on clothing as source-indicating was insufficient where the label also displayed more traditional source-indicating words); *Florists' Transworld Delivery*, 106 USPQ2d at 1793 (discounting form declarations offered to show acquired distinctiveness of color black for flower and live cut floral arrangements because accompanying photograph of product packaging contained other matter).

Third, the declarations are "conclusorily worded [and] fail to explain what it is about [the applied-for mark] that is unique or unusual, or distinctive from those of [Applicant's] competitors." *In re Pacer Tech.*, 338 F.3d 1348, 67 USPQ2d 1629, 1633 (Fed. Cir. 2003). The key parts are the statements that "[e]ngines having the appearance and shape shown in the attached drawing and photograph are known to me as being sold by Honda" and that it is "my understanding that the engine appearance and shape shown in the attached drawing and photograph is well known and famous in the construction and power equipment industry as being the engine appearance and shape of engines sold by Honda." The phrasing "are known to me" is a more formal statement than what each declarant "knows" or "believes," and underscores the formulaic nature of the declarations. Furthermore, the phrasing that

each declarant has an "understanding that the engine appearance and shape … is well known and famous" is more in the nature of a statement that counsel would hope for than a statement of spontaneous personal knowledge. Moreover, neither statement explains what it is about the "engine appearance and shape" that associates the engine with Applicant.[77] Indeed, the declarations say little more than that each declarant is personally familiar with the GX Engine and associates it with Honda, an unremarkable statement given that each of the declarants' companies has distributed "engines of Honda" for long periods of time and the HONDA word mark is on the engine. *See Pohl-Boskamp*, 106 USPQ2d at 1051 (criticizing form declarations that indicated "that each declarant is himself or herself familiar with applicant's product and associates [the involved mark] with applicant alone.").

Finally, we cannot determine whether the witnesses are representative of GX Engine purchasers. While we would neither expect nor require scientific sampling in the use of customer declarations, some degree of geographic and customer diversity is necessary for the declarations to have significant probative value. *See Florists' Transworld Delivery*, 106 USPQ2d at 1793-94 (criticizing form declarations for lack of geographic diversity); *Pacer*, 67 USPQ2d at 1633 (criticizing form declarations for lack of customer diversity). Five of the declarations do not provide the address of the declarant, while two are from employees of the same company in California, two are from employees of the same company in Iowa, and two are from employees of the

---

[77] The latter statement does not reflect the declarant's own state of mind, but rather his "understanding" of the state of mind of "the construction and power equipment industry." This statement is improper lay opinion.

same company in Texas. There are two copies of the same declaration from a Virginia declarant. All of the declarations are from distributors, even though the record shows that, in addition to distributors, OEMs, retailers, and rental yards, among others, are GX Engine customers, and were included within the universes of the parties' surveys.

We therefore find that the declarations are not persuasive evidence of the acquired distinctiveness of the applied-for mark. *Pacer*, 67 USPQ2d at 1633; *see also Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC*, 124 USPQ2d 1184, 1205 (TTAB 2017) (finding distributor declarations regarding end consumer recognition of claimed PRETZEL CRISPS mark to "have little probative value" in analysis of acquired distinctiveness).[78]

### b. Surveys.

Both parties submitted surveys. Applicant submitted an acquired distinctiveness survey conducted under the direction of George Mantis, while Opposer submitted two surveys conducted under the direction of Hal Poret: an acquired distinctiveness survey; and a second survey that purported to test the impact of color on the recognition of the trade dress of the GX Engine.[79] Both Mr. Mantis and Mr. Poret

---

[78] The parties agree that the class of purchasers for these engines does not include many members of the general public, so we do not fault the proffered testimony as being non-reflective of the perceptions of the target market, as we otherwise might. *Compare In re Soccer Sport Supply Co.*, 507 F.2d 1400, 184 USPQ 345, 348 (CCPA 1975) (form affidavits of industry professionals given some weight where such professionals, along with members of general public, were in the purchaser class) *with In re David Crystal, Inc.*, 296 F.2d 771, 132 USPQ 1, 2 (CCPA 1961) (substantially discounting affidavits of industry professionals where the primary market was consisted of members of the general public); *In re Meyer & Wenthe, Inc.*, 267 F.2d 945, 122 USPQ 372, 376 (CCPA 1959) (same).

[79] Because color is not claimed as part of the applied-for mark, we do not find Mr. Poret's second survey to be helpful on the issue of acquired distinctiveness, and we do not discuss the substance of this survey further.

have been qualified as survey experts in previous court and Board cases, and on the basis of their experience, education, and training, we find that each of them is qualified to opine on the issue of acquired distinctiveness on the basis of his survey, and to critique the other's survey.

Not surprisingly, the "surveys reported results that conflict with one another." *Pro Mark Brands Inc. v. GFA Brands, Inc.*, 114 USPQ2d 1232, 1247 (TTAB 2015). Mr. Mantis testified that his survey showed that a net 42.4% of the relevant universe associates the GX trade dress with Applicant, while Mr. Poret testified that his survey showed that the net association figure is 18.1%. Each vigorously criticized the other's methodology and conclusions.

"Survey evidence is subject to review for its probative value, based on factors including the design of the survey, the questions asked, and the experience of the surveyor." *In re Hotels.com LP*, 573 F.3d 1300, 91 USPQ2d 1532, 1536 (Fed. Cir. 2009). "[W]e recognize that no survey is perfect," *AVA Enters., Inc. v. Audio Boss USA, Inc.*, 77 USPQ2d 1783, 1787 (TTAB 2006), and here there are flaws in both surveys that reduce their probative value on the issue of acquired distinctiveness. Both in terms of the nature of the flaws (discussed below), and in light of the facts and circumstances here, we find that the flaws affect Applicant much more significantly than Opposer. Two such circumstances are that Applicant bears the ultimate burden of proving acquired distinctiveness, and that it relies heavily on its survey to carry that burden. *See British Seagull Ltd. v. Brunswick Corp.*, 28 USPQ2d 1197, 1202 (TTAB 1993), *aff'd*, 35 F.3d 1527, 32 USPQ2d 1120 (Fed. Cir. 1994), *cert. denied*, 514

U.S. 1050 (1995). As discussed below, while no single flaw in Applicant's Mantis survey is fatal, the cumulative impact of the flaws renders it insufficient to show that the applied-for mark has acquired distinctiveness in view of the record in this case.

The two surveys are similar in many respects. Both were conducted by telephone using an Internet website that respondents were required to access online. Both used essentially the same survey universe, purchasers of engines embodying the applied-for mark and purchasers or renters of products containing such engines. Both asked similar (and generally-accepted) questions to test acquired distinctiveness, with one key difference that we discuss in the text below.[80] Both used the accepted protocol of showing one group of respondents (the "test group") the involved mark and a separate group of respondents (the "control group") a different mark intended to determine the level of survey "noise," which Mr. Mantis described as "responses that are unrelated to the subject matter that we're studying." Tr. 26:12-16.[81] Finally, both used as survey stimuli photographs of actual engines, modified to delete brand names and certain

---

[80] Respondents in both surveys were shown photographs of engines and were asked whether they associated the engine (Mantis survey) or the appearance of the engine (Poret survey) with a particular company or companies (Mantis) or manufacturer or manufacturers (Poret). Respondents who associated the engine or its appearance with a particular company or manufacturer were then asked whether that association was with one, or more than one, company or manufacturer. Respondents who answered one company or manufacturer were asked to identify it, and, through a series of questions, to explain why they made the association. 185 TTABVUE 232-238; 199 TTABVUE 264-265.

[81] Mr. Poret similarly explained that "[i]n the context of secondary meaning, a control is a procedure for determining what the tendency of respondents is to name the particular source, such as Honda, for reasons other than the association of the specific mark at issue with Honda; for instance, guessing or just simply naming a very popular company or brand that's known for this type of engine or any other reasons that have nothing to do with the specific design at issue." Tr. 30:18-31:1.

other features, rather than the mark as shown in the application drawing and a suitable control drawing.

The use of photographs of engines is a fundamental problem. In the Mantis survey, respondents in the test group were shown the photograph reproduced below on the left, while respondents in the control group were shown the photograph reproduced below on the right (185 TTABVUE 240-241):[82]

 

The test group photograph on the left was a photograph of a GX Engine provided by Applicant's counsel, Mantis Tr. 95:20-22, which Mr. Mantis understood to embody the design in the application. Tr. 27:10-16. He used the photograph instead of the application drawing because "to use a drawing may have presented some abstract image to a respondent, who then may or may not be able to relate it to anything," Tr. 27:17-23, even though he characterized the survey universe, which consisted of "organizations that purchase or may purchase horizontal shaft engines," Tr. 13:9-12, "as a sophisticated audience." Tr. 59:21-23. We further note that the stimuli photographs (particularly that of the GX Engine), while not depicting colors,

---

[82] We have reproduced these photographs exactly as they were shown to respondents.

portrayed different components in differing shades, which gives the impression of different colors.

Use of a photograph rather than the actual drawing in the application is problematic, as the Board pointed out in the first Board case in which Mr. Mantis testified that he was qualified as a survey expert. Tr. 8:15-18. In that decision in *Miles Labs. Inc. v. Naturally Vitamin Supplements Inc.*, 1 USPQ2d 1445 (TTAB 1986), the Board held that the use of a photograph of an actual product as a survey stimulus "would have introduced irrelevant matter, thereby destroying any probative value of the survey for our purposes." 1 USPQ2d at 1459. The Board stated that its decisions, "in contradistinction to those of courts in infringement actions, have held that the association of other features, not part of the matter sought to be registered, reduces the survey's probative value in proceedings concerning registrability." *Id.* at 1460 (citing *McDonough Power Equip., Inc. v. Weed Eater, Inc.*, 208 USPQ 676, 685 (TTAB 1981) (criticizing likelihood of confusion survey using stimulus that "introduced other features such as color and applicant's principal house marks 'WEED EATER' and swirl design . . ."")).[83] The Board has applied this general principle in subsequent cases. *See, e.g., Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*, 115 USPQ2d 1816, 1830 n.20 (TTAB 2015); *Carl Karcher Enters. Inc. v. Stars Rest. Corp.*, 35 USPQ2d 1125,

---

[83] The Board did not establish a *per se* rule in *Miles Labs.* that an actual product could never properly be used as a survey stimulus in a Board proceeding. *Id.* at 1460 n.47. In *British Seagull*, a reported Board decision after *Miles Labs.*, Mr. Mantis used a photograph of an outboard engine as the stimulus in an acquired distinctiveness survey regarding the color black. The Board did not decide in *British Seagull* whether his use of a photograph was proper because it found that his survey did not show acquired distinctiveness in any event. 28 USPQ2d at 1201-02.

1131-32 (TTAB 1995) (a case in which Mr. Mantis presented a survey using cards that reproduced the drawings of the marks in the opposed applications); *Marshall Field & Co. v. Mrs. Fields Cookies*, 15 USPQ2d 1321, 1334 (TTAB 1992). Indeed, Mr. Mantis invoked the Board's discussion of an appropriate stimulus in *Miles Labs.* as a basis for criticizing Mr. Poret's color survey. Tr. 67:1-15; 69:1-7.[84]

We have reviewed the verbatim answers of respondents in the Mantis survey whom he counted as associating the test group engine with Applicant in response to questions probing the reasons for that association. Those responses strongly suggest, among other things, that Mr. Mantis's use of a photograph instead of the application drawing was problematic because, consistent with the warnings of our case law, it did indeed introduce features that are "not part of the matter sought to be registered" into his survey. *Miles Labs*, 1 USPQ2d at 1460.

Applicant claims that "the GX Trade Dress comprises the specific styling elements of each component (e.g., the complementary lines, beveling, and shapes), which together express the overall distinctive cubic look of the GX Trade Dress." 208 TTABVUE 20. Mr. Mantis acknowledged that the applied-for mark shows the front view of the engine only, Tr. 80:3-10, and includes no claim to color, Tr. 81:7-21, but the test group photograph shows the entire front of the GX Engine, including the engine's recoil cover, rewind handle, and speed control and fuel choke indicator

---

[84] In Mr. Mantis's rebuttal report criticizing Mr. Poret's surveys, he also cited Professor McCarthy's treatise for the proposition that "[i]t is the mark as shown in the application and as used on the goods described in the application, which must be considered, not the mark as actually used by the Applicant." Mantis Tr. 178:5-15.

decals, and a white fuel tank, a black air cleaner cover, and a fan cover in a color between black and white are clearly visible. None of these elements is part of the applied-for mark.

A number of respondents whom Mr. Mantis counted as associating the test group engine with Applicant mentioned specific features of the engine (including ones that are not part of the applied-for mark) as their reason for the association, and we find that such responses are the result of the introduction of color tones through the use of the photographs. Mr. Mantis acknowledged that the photographs depicted use of three colors and that he was aware that Applicant's engines used a tri-color red, white, and black color scheme. Tr. 97:3-98:22. He also acknowledged that on the basis of his earlier likelihood of confusion surveys in the *Pep Boys* and *Powertrain* civil infringement suits, in which he used photographs of the accused products, Tr. 101:2-10; 104:11-21, he knew that it was possible that respondents in his survey here would be familiar with the colors of the GX Engine. Tr. 106:13-107:1. In the verbatim responses in his survey here, multiple respondents stated, in response to questions about why they associated the engine with Applicant, that they did so at least in part because of color. We set forth below the relevant portions of some representative examples of such responses:

● Respondent 65: "Basically the appearance of it and the color of the gas tank."
● 77: "Looks just like Honda. Hondas are red . . ."
● 88: "It has a white gas tank on top of the engine."
● 90: "The white metal gas tank, everything in it looks like a Honda."
● 99: "Gas tank, red engine and the intake assembly."
● 118: "It's a black and white photograph, but I know it's a red-and-white engine."
● 121: "I would just say the shape and look of it. If it wasn't black and white, it would be red, the engine would be painted red."

●129: "The fuel tank is white and on top of the engine."
●130: "The gas tank, the color and shape of the gas tank. It appears to be white."
●135: "It has a white gas tank and large gas cap."
●141 "Although it's a black-and-white photo, I know it's red."
●157: "It's got the white gas tank and the same."
●171: "The white gas tank. It's pretty typical of Honda."
●189: "Well, the white tank and where the air filter is and the carburetor and just about everything on it."

Although Mr. Mantis did not include, within his count of respondents who associated the engine with Applicant, three respondents who gave color alone as the reason for associating the engine with Applicant, Tr. 138:16-19, he did include 21 other respondents who "mentioned color in combination with a design element." Tr. 48:4-9. His rationale was that "the purpose of the study was to assess whether the design of the engine depicted in the application functions as a source indicator. If individuals mention[ed] design or even overall look, those are appropriate to be considered as relating to the subject matter that we're testing." Tr. 43:21-44:2.

We do not find this rationale persuasive. It is impossible to determine the precise extent to which the presence of the color shading in the photograph influenced these respondents' recognition of the design or overall look of the engine,[85] or whether they would have associated a color-neutral engine with Applicant. Mr. Mantis admitted that he had no way to know what the results would have been if the photograph had used an all-black GX Engine. Tr. 144:7-12. This uncertainty, which could have been avoided by use of the application drawing (perhaps modified to remove the portion depicted in dotted lines) as the stimulus, negatively affects the probative value of

---

[85] Only Respondent 171 expressly gave color as an *additional* reason for associating the engine with Applicant, in response to the question "Anything else?"

these responses.[86] It is important to bear in mind that such surveys are supposed to test only whether an *applied-for mark* is viewed, *by itself*, as a source-indicator. This basic premise infuses all aspects of the acquired distinctiveness inquiry, including, for example, the well-settled principle that advertising or use that features other marks or potential source-indicating material that are absent from the application fails to demonstrate that the mark at issue, *by itself*, has acquired distinctiveness. *See, e.g., In re La. Fish Fry Prods., Inc.*, 797 F.3d 1332, 116 USPQ2d 1262, 1265 (Fed. Cir. 2015); *In re Chem. Dynamics, Inc.*, 839 F.2d 1569, 5 USPQ2d 1828, 1830 (Fed. Cir. 1988); *In re Soccer Sport Supply Co.*, 507 F.2d 1400, 184 USPQ 345, 348 (CCPA 1975); *In re McIlhenny Co.*, 278 F.2d 953, 126 USPQ 138, 140-41 (CCPA 1960).[87]

Other deficiencies of the Mantis survey further reduce its probative value. First, Applicant seeks registration of the appearance of the GX Engine, which it describes as the "configuration of an engine with an overall cubic design." In its brief, Applicant characterized its mark as "the complementary appearance of these components [that] creates the *overall* distinctive cubic look of the GX." 208 TTABVUE 9 (emphasis in original). The key acquired distinctiveness questions in the Mantis survey, however, did not focus respondents on the configuration, appearance, or look of the engine in

---

[86] Mr. Mantis testified that the respondents in this category accounted for about 10% of the total number of respondents in the test group. Tr. 115:7-20. In the Poret survey, which used a grayscale photograph of a GX Engine, 41.1% of the respondents in the test group identified the appearance of the engine with Applicant. Tr. 38:20-39:5. This figure is very close to what the percentage of such respondents in the Mantis test group would have been if all of the respondents who mentioned color were excluded.

[87] *See also Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 95 USPQ2d 1333, 1349 (5th Cir. 2010); *Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 87 USPQ2d 1655, 1665 (3d Cir. 2008).

the photograph; instead, respondents were asked about the association of "the engine shown on your screen" or "this engine" with any particular company or companies that make engines. 185 TTABVUE 232, 236.

In *British Seagull*, in which Mr. Mantis's survey similarly used a photograph of a debranded engine, his questionnaire asked respondents if they "associated *the color of* the engine with one particular company or more than one company," 28 USPQ2d at 1201-02 (emphasis added), not whether they associated "the engine" with one company or more than one company. The form of this question in *British Seagull* focused respondents on the specific issue to be tested, namely, whether the color black identified one and only one source of engines.[88] In contrast, the Mantis survey questions here, rather than using a question designed to focus respondents on the features claimed in the application drawing, invited respondents to give responses about "the engine on the screen" or "this engine."

A number of respondents appear to have accepted this invitation in responding to the questions asking "What makes you associate this engine with [Applicant]?" We set forth below representative responses in which respondents indicated that they associated the engine with Applicant because they knew that Applicant made it, without giving a specific appearance-related reason (Group 1), or indicated that they

---

[88] Here, of course, the applied-for mark does not consist of a single feature of the engine like color, but we still find Mr. Mantis's question somewhat problematic. The counterpart questions in Mr. Poret's survey asked respondents about the association of "the overall appearance of this engine" with any particular source. 199 TTABVUE 265. These questions better focused respondents on whether the engine's appearance *per se* identifies one and only one source.

knew that the engine came from Honda because it looked like the Honda engines with

which they worked (Group 2):[89]

**Group (1)**:
●Respondent 18: "Just extremely familiar with them. We work with them all the time. That looks to be a 5.5 horse or a GX 160. Just the model number."
●47: "The familiarity of my experience with power equipment using this engine. I've rented equipment using this engine. It's been on all types of equipment that I've seen. I've rented equipment that has this engine on it."
●70: "I have one. I have a Honda engine in my machinery. No, I just know because I have a Honda. I have one."
●83: "It's the industry I'm in. These engines are used in the industry I'm involved in. Extremely familiar. I work on them so I know virtually everything about them."

**Group (2)**:
●Respondent 11: "It looks like a Honda engine. I've had Honda engines long enough to know that it's a Honda engine."
●15: "Just the way it looks. It's what we have that powers all our small rental equipment. I see them every day. That's what we use, that particular engine manufacturer, Honda."
●24: "Because it looks like the 50 Honda engines I have at my store."
●27: "It looks just like a Honda motor. The picture in black and white, it looks like I seen thousands of them. I probably start five or ten of them. A lot of the equipment we have, Honda motors on it."
●72: "Honda cause we service them and that's what they look like. There are a lot of Honda products like that out there. . . . We sell a lot of them."
●77: "I've been working with them a long time. I know what they look like. All the same design of a Honda 5.5, Honda 5.5 GX160. That's what it looks like, GX 160 Honda model."
●97: "Just the appearance. I'm pretty familiar with Honda engines. I'm in the construction business and I have multiple equipment with Honda engines on them."
●128: "I've just seen a lot of them and that's what they look like. They put on pumps, edgers, trimmers. They're just very popular."
●156: "It just looks like the engine I have. We have more than one of, very familiar with, has the one hand pull. Looks like something that we use."
●166: Because I have hundreds of Honda and it looks just like this."
●180: "If we can, we get Honda motors on all the equipment that we buy. So I am very familiar with the profile of this particular motor, even though it doesn't have any markings."

---

[89] Respondents 77, 129, and 189 also mentioned color, as discussed above.

●181: "For one I used to be a mechanic and deal with a lot of engines that are overhead valve engines. The motor on my generator looks just like that."

●189: "Well I'm actually a certified Honda technician and know exactly what they look like. Well the white tank and where the air filter is and the carburetor and just about everything on it. I could even tell you the bolt size. I work on Hondas."

"[G]iven applicant's market share, it 'is not surprising' that interviewees could recall that applicant makes [engines] with [this] body shape 'in light of applicant's sales and advertising, its market share and the length of time that it has sold' [engines]." *Stuart Spector Designs*, 94 USPQ2d at 1571 (quoting *British Seagull*, 28 USPQ2d at 1201-03). Thus, while the Mantis survey may establish that a large portion of interviewees are aware that Applicant makes engines with the overall appearance of the GX Engine, the survey does not prove that the claimed elements in the applied-for mark are the reason they associate the engine with Applicant. *See British Seagull*, 28 USPQ2d at 1202 (finding that Mr. Mantis's survey in that case did "not establish that black has acquired secondary meaning as an indication of applicant as the source for all black engines"). Because the Mantis survey questions here did not focus respondents on the appearance of the engine as depicted in the applied-for mark, rather than on the engine itself, the responses of these respondents do not necessarily "prove that these people believe that all engines [with the appearance of the GX] come from applicant or from any single source." *Id*. at 1203; *see also Stuart Spector Designs*, 94 USPQ2d at 1571 (according little probative value to survey evidence regarding recognition of guitar shapes drawn on cards because "at most this survey may indicate that a certain percentage of the respondents associate these shapes historically with applicant or applicant is the most well known manufacturer, but not that the shapes connote single source."). The failure to focus

respondents on the appearance of the engine rather than on the engine itself reduces the probative value of the survey results.[90]

Second, we find that the control photograph used in the Mantis survey (reproduced again below on the left) was problematic. We have also reproduced below on the right the control photograph used in the Poret acquired distinctiveness survey, which was a more appropriate control.

 

Mantis Control (Briggs & Stratton engine)      Poret Control (Subaru Robin engine)

A control group in a survey is designed to eliminate "noise" ("responses that are unrelated to the subject matter that we're studying.") Mantis Tr. 26:12-16. Professor Diamond, whom both Mr. Mantis and Mr. Poret recognized as an authority on surveys, Mantis Tr. 90:8-20; Poret Rebuttal Tr. 78:3-9, is the author of the *Reference Guide on Survey Research*, Reference Manual on Scientific Evidence (2d ed. Fed. Jud. Ctr. 2000) ("*Diamond*"),[91] in which she discusses the general principles regarding the selection of survey controls as follows:

> In designing a control group study, the expert should select
> a stimulus for the control group that shares as many

---

[90] Focusing respondents on "this engine," rather than on the "appearance of this engine," might not have been problematic if Mr. Mantis had used the application drawing as the test group stimulus because the drawing, by definition, shows the appearance of an engine, not an actual engine.

[91] The *Diamond* work is available at www.fjc.gov/public/pdf.nsf/lookup/sciman04.pdf.

characteristics with the experimental [test] stimulus as possible, with the key exception of the characteristic whose influence is being assessed. A survey with an imperfect control group generally provides better information than a survey with no control group at all, but the choice of the specific control group requires some care and should influence the weight the survey receives. For example, a control stimulus should not be less attractive than the experimental stimulus if the survey is designed to measure how familiar the experimental stimulus is to respondents, since attractiveness may affect perceived familiarity. Nor should the control stimulus share with the experimental stimulus the feature whose impact is being assessed.

*Diamond* at 258. *See also Anheuser-Busch*, 115 USPQ2d at 1830 n.21.

Mr. Mantis's control photograph depicted a debranded Briggs & Stratton engine, which was brought to his attention by Applicant, Tr. 151:18-21, and which he discussed with Applicant's employees and counsel, who later provided the photograph that he used. Tr. 149:15-150:3; 152:18-25. He selected this engine because "it isolates or does not contain various elements that contribute to the design… enumerated in the application." Tr. 28:1-7. Specifically, "when viewing there is no angle on the gas tank that is complementary to the fan cover. The tank, itself, is -- appears to be higher, a different height, if you will. The air cleaner is located in a different position. The carburetor is located in a different position. Particularly, the [carburetor cover] does not have the ribbing. … And my belief is that the control engine does not evoke this overall cubic look that the Honda has" and "does not have the beveling that goes across the circumference of the engine." Tr. 28:9-17, 22-29:1.

Mr. Poret criticized Mr. Mantis's control engine on several grounds, the key one being that "he used a control engine with a different overall configuration from the applied-for mark." 209 TTABVUE 22. Mr. Poret opined that Mr. Mantis's control

"shows an engine that is meaningfully different not only in the elements that comprise the mark, but in the overall configuration and layout of the major components," Rebuttal Tr. 33:22-34:1, and that the "control engine would need to show the same type of engine in terms of that configuration." Rebuttal Tr. 34:10-12. He testified that the control engine displays a panel mount air filter rather than a high mount one, as on the GX Engine, that it is positioned differently than on the GX Engine, Rebuttal Tr. 34:15-21, and that the control engine used a silver muffler cover, unlike the GX Engine. Rebuttal Tr. 35:15-24. We find that Mr. Poret's Subaru Robin engine control was more appropriate than Mr. Mantis's control "[b]ecause it does have the same general layout of the three major components in terms of the place of the fuel tank and the fan cover and the air filter and carburetor cover and it has the same type of air filter cover," Rebuttal Tr. 35:25-36:13, but does not embody the applied-for mark.

Mr. Mantis admitted on cross-examination that the possible use of the Subaru Robin as a control had originally been brought to his attention by Applicant's counsel and principals, that he was told that there could be an argument over some similarity with the GX Engine, that he had summarily dismissed the use of the Subaru Robin as a control, Tr. 162:15-163:1, 22-165:4, without reviewing it or making an independent determination about its similarity to the GX Engine, 165:18-21, and that Applicant's counsel had not made him aware that Applicant had entered into a settlement agreement in which Applicant had agreed that the Subaru Robin was not the same as or substantially similar to the GX Engine trade dress and did not infringe

that trade dress. Tr. 167:15-168:10. The fact that Applicant had agreed that the Subaru Robin did not embody the applied-for mark supports our conclusion that it was a more appropriate control than the one used by Mr. Mantis.

We agree with Mr. Poret that the control engine used by Mr. Mantis did not "share[] as many characteristics with the experimental [test] stimulus as possible, with the key exception of the characteristic whose influence is being assessed," *Diamond* at 258, and that the control engine used by Mr. Poret came closer to that objective. Mr. Mantis's use of the Briggs & Stratton control engine further reduces the probative value of his survey.

We turn finally to Mr. Poret's survey, which reported a net level of association of the GX Engine with Applicant of 18.1%. Mr. Mantis criticized it on multiple grounds. 208 TTABVUE 45-48.[92] We have carefully considered these criticisms and find that they do not significantly reduce the probative value of Mr. Poret's survey in assessing the level of association of the applied-for mark with Applicant.[93] The flaws in the Mantis survey discussed above suggest that his reported net 42% level of association of the GX Engine with Applicant is an inaccurate measure of the true level of

---

[92] These were the use of an inappropriate control, improper sampling, mischaracterization of the control engine, "order bias," and the failure to independently validate the participation of respondents in the survey. We have addressed the gist of the control criticism above in finding that Mr. Poret's control was more appropriate than Mr. Mantis's.

[93] The failure-to-validate criticism is meritless because Mr. Poret used a professional telephone interviewing service whose calls were monitored by supervisors, Mr. Poret's staff, and Mr. Poret himself. Poret Rebuttal Tr. 55:17-59:19. Mr. Mantis acknowledged that he could not tell how much (if at all) order bias affected the results of Mr. Poret's survey, or even whom it favored. Mantis Tr. 176:3-177:15. Mr. Mantis similarly did not show how the difference in the sample proportions used by Mr. Poret, or the misdescription of the Subaru Robin control engine, affected the results of Mr. Poret's survey.

association of the applied-for mark with Applicant, and that the true level of association is likely closer to the net level reported in the Poret survey, even assuming a higher level than Mr. Poret's reported net 18% due to the flaws in his survey discussed by Mr. Mantis.

In any event, a net level of association of the applied-for mark with Applicant somewhere in the range between Mr. Mantis's net 42% and Mr. Poret's net 18% has little evidentiary value on the issue of the acquired distinctiveness of the applied-for mark. *Frito-Lay*, 124 USPQ2d at 1206 (finding that survey conducted by Mr. Mantis in which he concluded that 38.7% of respondents associated disputed term PRETZEL CRISPS with only one company involved a figure in a range that has been considered "marginal," and that his survey and other record evidence were insufficient to show that the term had acquired distinctiveness). "Accordingly, we conclude that [A]pplicant's survey is not particularly probative of acquired distinctiveness and does not overcome the high bar set by" the highly-non-distinctive nature of the applied-for mark and the evidence of third-party use of similarly-shaped engines. *Stuart Spector Designs*, 94 USPQ2d at 1571.

### 2. Circumstantial Evidence

#### a. Length and Exclusivity of Use

The record establishes that Applicant has sold the GX Engine in the United States for more than 30 years. "While long use of a mark is a relevant factor to consider in determining whether a mark has acquired distinctiveness, it is not necessarily conclusive or persuasive." *Id.* at 1571-72 (citations omitted). The probative value of

Applicant's long use of the design is diminished here because Applicant does not dispute that during much of that period other general purpose utility engines in the marketplace have had similar configurations. 208 TTABVUE 34.[94] *Id.* at 1572; *see also Gibson Guitar*, 61 USPQ2d at 1952; *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 97 USPQ2d 1048, 1057-58 nn. 4 & 5 (Fed. Cir. 2010) (where a competitor also used the color blue for its competing products, plaintiff could not show exclusive use of the color blue, which was required to demonstrate secondary meaning).

### b. Sales and Advertising

Applicant argues that the "amount of sales and number of customers for the GX are additional strong evidence that the GX Trade Dress has secondary meaning." 208 TTABVUE 37. During prosecution, Mr. Conner testified that from 2000-2006, American Honda achieved revenues amounting to over $860,000,000 from sales of the GX Engine and an additional $500,000,000 from sales of products containing the GX Engine. His trial testimony about sales figures from 2006-2015 was designated Confidential, but we have reviewed those figures and they are also very substantial. There is no question that Applicant's GX Engine is the leader in the general purpose utility engine market, and Opposer does "not dispute that the GX engine has been a commercially successful product." 209 TTABVUE 17. As with Applicant's evidence of long-term use, however, "while sales volume figures may demonstrate the growing

---

[94] Applicant instead argues that it "does not seek a trade dress covering all engines with the same general configuration" but rather "only the *specific, overall cubic look depicted in the Application.*" 208 TTABVUE 34.

popularity of the products, mere figures demonstrating successful product sales are not probative of purchaser recognition of a configuration as an indication of source." *Stuart Spector Designs*, 94 USPQ2d at 1572 (citing *Braun, Inc. v. Dynamics Corp.*, 975 F.2d 815, 24 USPQ2d 1121, 1133 (Fed. Cir. 1992) and *In re Bongrain Int'l (American) Corp.*, 894 F.2d 1316, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990)).

Applicant also argues that its "advertising activities strongly support a finding that the GX trade dress has achieved secondary meaning." 208 TTABVUE 35. Mr. Conner testified during prosecution that from 2000-2006 American Honda expended nearly $2,000,000 on advertising and promotion.[95] The advertising and promotion expenditure figures from 2006-2015 to which Mr. Conner testified at trial were designated Confidential, but we have reviewed those figures as well, and they are also substantial. In the absence of context for these figures, it is difficult to evaluate the significance of the total amount expended, but Opposer again does "not dispute that [Applicant] has spent a significant amount of money to advertise the GX engine." 209 TTABVUE 18.

"[I]t is well established that compelling sales and advertising figures do not always amount to a finding of acquired distinctiveness." *Stuart Spector Designs*, 94 USPQ2d at 1572. "[T]he more important question is how the alleged mark is being used, i.e., in what manner have consumers been exposed to the alleged mark so that we can impute consumer association between the configuration[] and the product producer.

---

[95] Advertising and promotion expenditure figures from the introduction of the GX Engine in the United States in 1983 through 2002 were not made of record during prosecution or at trial.

To determine whether a configuration has acquired distinctiveness, advertisements must show promotion of the configuration as a trademark." *Id.* "When advertisements are submitted as evidence of acquired distinctiveness, they must demonstrate the promotion and recognition of the specific configuration embodied in the applied-for mark and not of the goods in general." *AS Holdings*, 107 USPQ2d at 1838; *see also La. Fish Fry*, 116 USPQ2d at 1265-66 (advertising exemplars and expenditures to advertise LOUISIANA FISH FRY PRODUCTS unpersuasive to show acquired distinctiveness in the words FISH FRY PRODUCTS alone); *Soccer Sport Supply*, 184 USPQ at 348 (advertising displaying the design at issue along with word marks lacked the "nexus" that would tie together use of the design and the public's perception of the design as an indicator of source); *Long John Distilleries, Ltd. v. Sazerac Co.*, 426 F.2d 1406, 166 USPQ 30, 31 (CCPA 1970) (long use of unitary mark LONG JOHN did not prove that JOHN by itself indicated origin, especially where many others in the field of distilled beverages used JOHN).

The sort of advertising that can demonstrate that a trade dress has acquired distinctiveness is commonly referred to as "look for" advertising; that is, advertising that directs the consumer to "look for" the particular feature(s) claimed as a trademark. *See generally In re Black & Decker Corp.*, 81 USPQ2d 1841, 1843-44 (TTAB 2006). "In certain cases, the Board has been critical of an applicant's claim of acquired distinctiveness when the product design sought to be registered merely appears in advertising materials and there is no evidence of the promotion of the product design in such materials." *Id.* at 1844.

Applicant acknowledges that "'[l]ook-for advertisements are considered valuable evidence of secondary meaning," 208 TTABVUE 36, but argues that its advertising has consistently featured what it calls a "hero shot," a prominent depiction of the GX Engine, 208 TTABVUE 35, and that this hero shot advertising "is tantamount to 'look for' advertising." 208 TTABVUE 36. We reproduce a representative sample of Applicant's advertisements in the Appendix.

"'Look for' advertising refers to advertising that directs the potential consumer in no uncertain terms to look for a certain feature to know that it is from that source. It does not refer to advertising that simply includes a picture of the product or touts a feature in a non-source identifying manner." *Stuart Spector Designs*, 94 USPQ2d at 1572 (finding that advertisements featuring prominent "beauty shots" of guitar body shape were not examples of "look-for" advertising and were not probative of acquired distinctiveness). Applicant's advertisements prominently display the GX Engine, but they do nothing to draw the attention of the viewer to any of the claimed features of the applied-for mark.[96] John Lally, manager of advertising and ecommerce for American Honda, could not recall any advertisements for the GX Engine that described its appearance or directed consumers to look for any particular shape. Tr. 33:15-24. The text and headlines accompanying the hero shot of the engine in the advertisements in the record emphasize the Honda brand name that appears on the

---

[96] The advertisement in the Appendix bearing the headline "Honda's Redesigned GX Engines. The Foundation of Success" and showing the revised GX Engine in concrete perhaps comes closest to focusing on the engine's shape per se. But it too does not identify that shape as Applicant's mark, and it includes images of the engine bearing Applicant's house mark and color scheme.

engine itself and elsewhere in the advertisements (often in red) as the source identifier for the engine, and tout the engine's efficiency, reliability, adaptability, and durability, not its appearance. Applicant's advertising "simply shows the product like any advertising would," *id.* at 1574, and promotes its desirability, but does not refer to its general appearance, much less the specific features of the applied-for mark. This is not the "look-for" advertising that is capable of creating acquired distinctiveness in any particular element(s) depicted. *See id.* at 1572-74.[97]

The Board acknowledged in *Stuart Spector Designs* that "[t]here are cases where the lack of 'look for' advertising [is] not fatal in view of industry practice to recognize certain configurations as source indicators." *Id.* at 1574.[98] But for consumers to have any realistic chance of recognizing the applied-for mark in Applicant's advertising—separate and apart from: (1) the HONDA word mark, (2) the engine's red, white, and black color scheme, and (3) the other elements of the three-dimensional engine that are also not part of the applied-for mark—Applicant's advertising would have to

---

[97] For examples of uses of "look-for" advertising, *see Owens-Corning*, 227 USPQ at 423-24; *In re Data Packaging Corp.*, 453 F.2d 1300, 172 USPQ 396, 398-99 (CCPA 1972); *In re Hehr Mfg. Co.*, 279 F.2d 526, 126 USPQ 381, 382-83 (CCPA 1960) (reversing refusal to register red rectangular sticker on which applicant's other marks were placed based on advertisements urging consumers to look for the red sticker); *see also Change Wind*, 123 USPQ2d at 1468 (finding that an advertisement stating that "You can distinguish Change Wind's VAWT from its competitors by the unique configuration of wings over a conical tower" was an example of "look-for" advertising).

[98] The *Yamaha* and *Black & Decker* cases cited by the Board in *Stuart Spector Designs* on this point, and relied upon by Applicant, 208 TTABVUE 35-36, are distinguishable. In those cases, the evidence showed an industry practice of using the particular features at issue (guitar headstocks and key head designs, respectively) as stand-alone source identifiers, making the appearance of these features in advertisements inherently source-indicating. There is no comparable evidence here that engine designs per se are used as source identifiers in the industry.

"direct[] the potential consumer in no uncertain terms to look for" the applied-for mark. *Id.* Headlines in Applicant's advertising such as "We Work Well Under Pressure," "One Engine for All," and "All of Our Engines Are Green," and text discussing product attributes such as fuel efficiency, toughness, and quiet operation, simply do not do so.

On this record, the absence of advertising directing consumers to the specific features of the applied-for mark undermines Applicant's claim of acquired distinctiveness based upon its advertising. *Id.* at 1573-74; *AS Holdings*, 107 USPQ2d at 1838-39; *see also In re ic! Berlin brillen GmbH*, 85 USPQ2d 2021, 2023-24 (TTAB 2008) (absence of look-for advertising was the "chief reason" for finding no acquired distinctiveness for claimed eyewear earpiece mark bearing applicant's word mark because "word and logo marks are different in nature from applicant's earpiece design" and the Board was "unable to conclude that the ultimate consumer would view the earpiece design as applicant's trademark simply because it is the earpiece portion of the eyewear frame").

### c. Proof of Intentional Copying

Applicant also relies on what it calls "evidence of widespread, intentional copying of the Honda GX, which Opposers do not contest." 208 TTABVUE 39. Opposer acknowledges the copying, but contests its probative value "because there is no evidence that the third parties offered similarly shaped engines to create confusion as to source." 209 TTABVUE 21.

Applicant designated as Confidential all of Mr. Conner's testimony and related documents, including settlement agreements and demand letters, offered to support Applicant's claim that acquired distinctiveness has been shown through copying. We have reviewed that evidence and it establishes that various third parties sold engines that Applicant claimed infringed the overall three-dimensional trade dress of the GX Engine; that Applicant sent demand letters to many companies; that Applicant or American Honda filed the lawsuits discussed above; and that Applicant entered into settlement agreements with a number of third parties. This evidence generally shows that Applicant enforced its claimed three-dimensional trade dress aggressively and successfully demanded changes to the designs of various engines. *Cf. In re Wella Corp.*, 565 F.2d 143, 196 USPQ 7, 8 n.2 (CCPA 1977) ("Appellant argues that various letters (of record) from competitors indicating their discontinuance of use of its mark upon threat of legal action are evidence of its distinctiveness, but we agree with the TTAB that such evidence shows a desire of competitors to avoid litigation rather than distinctiveness of the mark.").

The probative value of the copying evidence is limited. The three-dimensional trade dress at issue in the *Powertrain* and *Pep Boys* cases, and in Applicant's enforcement efforts, contains multiple elements, including color, that are not part of the two-dimensional applied-for mark. We cannot directly infer from the copying of three-dimensional trade dress containing numerous elements, including color, that Applicant has separate and distinct trademark rights in its claimed "configuration of an engine with an overall cubic design" and "complementary lines, beveling, and

shapes." 208 TTABVUE 20. Given the highly-non-distinctive nature of the applied-for mark, the evidence of copying and Applicant's success in enforcement are insufficient to show acquired distinctiveness.

We find, on the basis of the record as a whole, that Opposer established a *prima facie* case that the evidence of acquired distinctiveness proffered by Applicant during prosecution was inadequate and that Applicant has failed to establish in this proceeding that the applied-for mark has acquired distinctiveness within the meaning of Section 2(f). *See Stuart Spector Designs*, 94 USPQ2d at 1576.

**Decision:** The opposition is sustained on the ground that the applied-for mark is primarily functional and on the ground that it is a non-distinctive product configuration that has not acquired distinctiveness.

## APPENDIX

### *Morton-Norwich* Categories of Evidence

**The '385 Patent**

The abstract of the '385 Patent states in part that

> A general-purpose internal combustion engine comprises an engine unit, a recoil starter, a fuel tank disposed on the engine unit and coupled with a precleaner, and a muffler disposed on the engine unit. The main air cleaner and the muffler are disposed laterally of the full tank in parallel relation to each other, the main air cleaner being located closely to the recoil starter, and the muffler being disposed remotely from the recoil starter.

The engine described in the abstract is shown in multiple drawings. Figure 1 is reproduced below:



U.S. Patent    Mar. 21, 1989    Sheet 1 of 4    4,813,385

FIG. 1

The "Background of the Invention" section of the '385 Patent addresses a problem resulting from the fact that general-purpose utility engines "are often used in dusty places," such that "the filters in the air cleaners of such internal combustion engines are liable to get clogged soon, and have to be frequently cleaned or replaced." 127 TTABVUE 12. It states that these engines "have a main air cleaner employing a filter of paper and/or urethane foam and a cyclone-type precleaner positioned laterally of

the main air cleaner," 127 TTABVUE 12, and discusses deficiencies in "prior air cleaner structures," which the invention seeks to remedy.

Claim 1 claims a

> general-purpose internal combustion engine comprising: an engine unit having a crank case and a cylinder; a recoil starter disposed adjacent and coaxially with respect to said engine unit; a fuel tank disposed over said crank case; a main air cleaner and a muffler disposed on said engine unit laterally of said fuel tank in parallel relation to each other, said main air cleaner being located to said recoil starter, said muffler being disposed remotely from said recoil starter and above the said cylinder; a precleaner connected to said main air cleaner and having an air inlet member disposed remotely from said muffler, said precleaner comprising an upper cleaner case and a lower dust pan which are detachably coupled to each other; said upper cleaner case having an air inlet duct projecting laterally and having a lower open end, said dust pan having said air inlet member which project laterally and opens upwardly, said air inlet member defining an air inlet port directed substantially downwardly, said cleaner case and said dust pan being coupled together, with said air inlet duct and said air inlet member held in registry with each other.

Claims 2-6 claim the engine according to claim 1, with additional claims. Claim 2 claims the engine according to claim 1, "wherein each of the said fuel tank, said muffler, and said main air cleaner is substantially rectangularly shaped as viewed in plan" (from above), while Claims 3-6 claim various structural features of the air cleaner and precleaner.

**The Japanese Utility Model Applications**

**The '344 Application**

The '344 Application covers

> A general-purpose internal combustion engine with a cylinder inclined slightly upward from the horizontal

direction and with intake and exhaust valve system in an overhead arrangement, characterized in that said intake and exhaust valve system is supported in a substantially horizontal position, said engine further comprising: a head cover that is removably installed in a substantially horizontal position relative to said cylinder head; a fuel tank that is located above said crankcase and cylinder and is supported by said crankcase and cylinder; a carburetor located on one side of said cylinder head and is connected to a suction port of the cylinder head; an air cleaner located above said cylinder head and over said carburetor and is connected to the latter; a muffler that is also positioned above said cylinder head but on the side thereof opposite to said air cleaner and that is connected to an exhaust port of said cylinder head, whereby the air cleaner and the muffler are located above the cylinder head and the head cover and on the left and right sides thereof, respectively; the upper surfaces of the fuel tank, air cleaner, and muffler are arranged to be substantially flush with one another; and the fuel tank, carburetor, air cleaner, and muffler are arranged substantially between a vertical surface that includes a crankshaft protrusion surface of the crankcase and a vertical surface that includes an outer surface of a fan cover located on the opposite side.

104 TTABVUE 41.

The most pertinent drawing in the '344 Application is reproduced below.



In the "Detailed Description of the Innovation" portion of the application, Applicant stated in pertinent part that

> This model is related to general purpose internal combustion engines that are used as sources of power for agricultural work, civil engineering work, and other work of all kinds. Internal combustion engines of this kind are not only compact and lightweight, but also adaptable to a wide variety of applications. For example, such engines needs [sic] to have a common main body, but can be equipped with different crankshafts, air cleaners, mufflers, or other equipments suited to the particular use. Further, such engines needs [sic] to allow for easy maintenance and care of different engine parts as made necessary by different environments and conditions of us. . . The purpose of this model is to provide an internal combustion engine that fulfills the above requirements necessary for general purpose internal combustion engines. . . There is a general purpose internal combustion engines [sic] in which the cylinder is titled slightly upward from the horizontal direction to reduce the height of the engine, thereby downsizing the engine and stabilizing the engine during use. This model is also based on a general purpose internal combustion engine format that has cylinders angled in this way, and intake and exhaust valves in an overhead arrangement. . . The fuel tank 9 is positioned above the crank case 1 and the inclined cylinder 2 . . . and the air cleaner 13 and muffler 16 are both positioned above the cylinder head. They are positioned in such a way that they fit substantially between the vertical surface that includes the crankshaft protrusion surface of the crankcase 1 and the vertical surface of the fan cover 23 located on the opposite side. Thus, the fuel tank 9, air cleaner 13, and muffler can be positioned in a space having a volume as large as possible above the crankcase 1, cylinder 2, cylinder head 3, and head cover 8. This is favorable from the design standpoint, since the aforementioned three parts (the fuel tank 9, air cleaner 13, and muffler 16) can be arranged compactly.

**The '961 Application**

The '961 Application discusses

A general purpose engine comprising: a carburetor installed on a fan cover side relative to an engine cylinder; an air cleaner located above the carburetor; a cover made integrally with an air cleaner case disposed outside of and facing the carburetor; a choke lever of the carburetor disposed to face the fan cover; and a fuel valve lever arranged adjacent to said choke lever, wherein said choke lever and said valve lever protrude outward through long holes formed in said cover.

104 TTABVUE 24.

The most pertinent drawing in the '961 Application is reproduced below.



The Detailed Description of the Innovation focuses on the "operations of the valve, choke, throttle, and recoil starter" that "start and stop general purpose engines." 104 TTABVUE 24. The Description states that the "object of this innovation is to provide a general purpose engine of improved operability and to prevent wrong operation" of the engine," which often results from the fact that the valve, choke, throttle, and recoil starter are positioned in different planes through the relative positioning of the carburetor, the air cleaner, and the fan cover, and the placement of the fuel valve lever and the choke lever on the carburetor cover. Neither the claim nor the

description discusses the "receded area where control levers are located" described in

the involved application.

**The '160 Application**

The '160 Application discusses a

> cooling device for an internal combustion engine, in which
> the lower portion of a fan cover attached to a lateral side of
> a crankcase is made flat, with a space used for
> compensating flattening-induced reduction in the volume
> of the air duct within the cover provided in the bottom
> portion under the above-mentioned fan cover.

The most pertinent drawings in the Application are reproduced below.



The Detailed Description of the Innovation states that the application "relates to

a cooling device for an internal combustion engine, in particular, to a general-purpose

internal combustion engine with forced air cooling." 104 TTABVUE 17. Making

reference to the numbers in the drawings above, the description states that "cooling

air is channeled to a cylinder 6 by a fan cover 5 provided on a lateral side of a

crankcase 4" and that "the fan cover 5 gradually expands in the direction of the

rotation $a$ of the fan 3." 104 TTABVUE 17. The description also states that due to the

reduction of the height of the crankshaft in an inclined-cylinder engine, the "bottom

portion 5a of the fan cover 5, as shown with a dotted line in Fig. 1, cannot be imparted a scroll-like curved shape" and instead "is made flat." 104 TTABVUE 17-18. This in turn causes a reduction in the size of the air duct, which impedes the smooth flow and amount of the cooling air. The innovation in the application is

> characterized in that the bottom portion 5a of the abovementioned fan cover 5 is rendered flat and a space S used for compensating the reduction in the volume of the air duct W1 due to the flattening is provided in the bottom portion under the above-mentioned fan cover 5 . . . as a result of which some of the cooling air flowing under the fan cover 5 smoothly flows through the above-mentioned space S, such that the engine can be efficiently cooled without reduction in the amount of cooling air, as described above.

104 TTABVUE 18.

**The '071 Design Patent**

The '071 Patent shows a three-dimensional engine in seven drawings. Reproduced below are Figures 1 and 2, which are described as "a front, top, and left side perspective view of an internal combustion engine showing my new design" and "a left side elevational view thereof," respectively.



FIG. 1    FIG. 2

**Representative Examples of Applicant's Advertising**





189 TTABVUE 77, 79.







## One Engine for All.

No matter which Honda small engine you choose, it's certified for all 50 states. Thanks to our advanced engine technology, with only minor modifications, Honda certifies to the stringent California and existing EPA Phase 2 emission requirements. This continues to reflect Honda's forward thinking with regard to emission regulations, air quality and the needs of our customers. All 50 states, all sorts of power equipment and one engine that makes sense for all. www.honda.com



**HONDA**
**E N G I N E S**

Built like no other.

©2007 American Honda Motor Co. Inc. For optimum performance and safety, please read the owner's manual before operating your Honda Power Equipment.

**EXHIBIT**
91200832 (Parent)
Applicant
Conner 9/10/2015

HEN_CONEXPO_8.375x10.875_HEN_CONEXPO_8.375x10.875 1/31/11 11:22 AM Page 1

*Visit Us At Booth 16607*



## Honda's Redesigned GX Engines. The Foundation Of Success.

With the newly-redesigned mid-range GX120, GX160, and GX200 to go along with the recently-introduced GX240, GX270, GX340 and GX390, the second generation of Honda GX Series Engines is now complete.

Featuring improved performance, lighter weight, great fuel economy and meeting EPA Phase 3 emission requirements without a performance-inhibiting catalyst, this is the winning lineup. Add to that Honda's 3-Year Warranty and unsurpassed reputation for reliability and it's clear how Honda can help your business. So come visit us at Booth 16607 and find out more concrete reasons to choose Honda.

engines.honda.com

**HONDA**
**E N G I N E S**

Built like no other.







189 TTABVUE 75, 77, 79, 80, 101, 127, and 132.